# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| KATHERINE ARCHUT, | : No.: 3:10-cv-01681 (FLW)(TJB) |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| ROSS UNIVERSITY SCHOOL OF | : |
| VETERINARY MEDICINE; DeVRY INC.; | : |
| corporation of the State of Delaware, and | : |
| ABC Corporations 1-5, being fictitiously | : |
| named subsidiaries of DeVry Inc., | : |
| | : |
| Defendants. | : |

---

# DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT

Dated: New York, New York
      June 22, 2012

Respectfully submitted,
SEYFARTH SHAW LLP

By     s/Howard M.Wexler
    Howard M. Wexler
    Michael F. Marino
    Jacob Oslick
    620 Eighth Avenue, 32nd Floor
    New York, New York 10018-1405
    Main Office Number:  (212) 218-5500
    Main Fax Number:  (212) 218-5526
    hwexler@seyfarth.com
    mmarino@seyfarth.com
    joslick@seyfarth.com
    *Attorneys for the Defendants*

# **TABLE OF CONTENTS**

Preliminary Statement ............................................................... 1

Statement of Facts .................................................................... 3

Standard of Review ................................................................. 12

Argument ................................................................................. 12

I.   The ADA, RHA, and NJLAD Do Not Apply Extraterritorially To
     Public Accommodations, Such as Universities ................... 12
     A.   Summary of Argument .......................................... 12
     B.   The Alleged Discrimination Occurred Entirely Within St.
          Kitts........................................................................ 12
     C.   The RHA Act Does Not Apply Extraterritorially ... 13
     D.   The ADA ................................................................. 14
     E.   The NJLAD ............................................................. 18

II.  Archut's Discrimination Claims Also Fail On Their Merits ............. 20
     A.   Summary Judgment Framework.............................. 20
     B.   Archut Is Not "Disabled" ...................................... 21
          i.    The ADA & RHA ........................................ 21
          ii.   The NJLAD ................................................. 25
     C.   Archut Is Not "Otherwise Qualified" ..................... 26
          i.    Archut Rejected An Offered Reasonable
                Accommodation ............................................ 26
          ii.   The Live Reader Was An Unreasonable
                Accommodation ............................................ 29
          iii.  Archut Did Not Document Her Need For A Live
                Reader........................................................... 32
     D.   Ross Did Not Deny Any Benefits to Archut ............. 34
     E.   Archut Also Cannot Support An Interactive Process Claim .... 35

III. Summary Judgment Is Also Proper On Archut's Contract Claim ..... 38

IV.  Archut Cannot Pierce The Corporate Veil Against DeVry ............... 39

Conclusion................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alotto v. ECSM Utility Corp, Inc.,*
2010 WL 5186127 (D.N.J. 2010)................................................................37

*Animal Sci. Prod., Inc. v. China Minmetals Corp.,*
654 F.3d 462 (3d Cir. 2011).....................................................................18

*Ansonia Bd. of Educ. v. Philbrook,*
479 U.S. 60 (1986)................................................................................27

*Asplundh Tree Expert Co., v. NLRB,*
365 F.3d 168 (3d Cir. 2004)....................................................................15

*Baer v. Nat'l Bd. of Med. Exam'rs,*
392 F. Supp. 2d 42 (D. Mass. 2005) ..........................................................24

*Brunner v. AlliedSignal, Inc.,*
198 F.R.D. 612 (D.N.J. 2001)..................................................................19

*Cattuna v. Sara Lee Corp.,*
2010 WL 3418354 (N.J. Super. A.D. 2010) ...........................................34, 35

*Christensen v. Harris County,*
529 U.S. 576 (2000) ........................................................................14, 17

*Cottrell v. Good Wheels,*
458 Fed. Appx. 98 (3d Cir. 2012) ..............................................................20

*D.G. Somerset Hills Sch. Dist.,*
559 F. Supp. 2d 484 (D.N.J. 2008) .............................................................21

*Dean-Hines v. Ross Univ. Sch. of Vet. Med.,*
05-CV-3486, Docket No. 30 (D.N.J. Aug. 10, 2006) ................................17, 18

*Diaz v. City of Phila.,*
2012 WL 1657866 (E.D. Pa. 2012)............................................................27

*Domurat v. Ciba Spec. Chem. Corp.,*
801 A.2d 423 (N.J. Super. A.D. 2002).......................................................25

*EEOC v. Arabian Am. Oil Co.,*
499 U.S. 244 (1991) ................................................................ 15, 16, 18

*Fogelman v. Greater Hazleton Health All,*
122 Fed. Appx. 581 (3d Cir. 2004) ...................................... 29

*Forbes v. St. Thomas Univ.,*
456 Fed. Appx. 809 (11th Cir. 2012) ................................... 33

*Forbes v. St. Thomas Univ., Inc.,*
2011 U.S. Dist. Lexis 57965 (S.D. Fla. 2011) ................... 30

*Frazier v. Simmons,*
254 F.3d 1247 (10th Cir. 2001) ............................................ 36

*Gonzales v. Nat'l Bd. of Med. Exam'rs,*
225 F.3d 620 (6th Cir. 2000) ................................................ 23

*Grubb v. Garbutt,*
2010 WL 3516847 (N.J. Super A.D. 2010) ......................... 25

*Halpern v. Wake Forest Univ. Health Sci's,*
669 F.3d 454 (4th Cir. 2012) ............................................ 31, 34

*Hankins v. The Gap, Inc.,*
84 F.3d 797 (6th Cir. 1996) .................................................. 27

*Herzog v. Loyola Coll. of Md., Inc.,*
2009 U.S. Dist. Lexis 94454 (D. Md. 2009) ....................... 24

*Leacock v. Temple Univ. Sch. of Med.,*
1998 WL 1119866 (E.D. Pa. 1998) ...................................... 32

*Love v. Law Sch. Admission Council, Inc.,*
513 F. Supp. 2d 206 (E.D. Pa. 2007) ............................ 22, 23, 24

*Loving v. Princess Cruise Lines, Ltd,*
2009 U.S. Dist. LEXIS 130477 (C.D. Cal. 2009) ............... 16

*Mastonicola v. Principi,*
2006 WL 3098763 (W.D. Pa. 2006) ..................................... 28

*Meisenhelder v. Fla. Coastal Sch. of Law, Inc.*,
2010 U.S. Dist. Lexis 57736 (S.D. Fla. 2010) .......................................... 24, 30

*Mershon v. St. Louis Univ.*,
442 F.3d 1069 (8th Cir. 2006) ........................................................... 34, 35

*Millington v. Temple Univ. Sch. of Dent.*,
261 Fed. Appx. 363 (3d Cir. 2008) ..................................................... 21, 31

*Morrison v. National Australia Bank Ltd.*,
130 S.Ct. 2869 (2010) ........................................................... 13, 17, 18

*Mucci v. Rutgers*,
2011 WL 831967 (D.N.J. 2011) .......................................................... 28, 33

*Norkunas v. Sandestin Inv., Inc.*,
2011 WL 31716 (N.D. Fla. 2011) ............................................................. 39

*Palotai v. Univ. of Md.*,
38 Fed. Appx. 946 (4th Cir. 2002) ........................................................... 23

*Papalini v. Sensient Colors, Inc.*,
2012 WL 1345353 (D.N.J. 2012) ............................................................. 19

*Parker v. Verizon Pa., Inc.*,
309 Fed. Appx. 551 (3d Cir. 2009) ........................................................... 35

*Peikin v. Kimmel & Silverman, P.C.*,
576 F. Supp. 2d 654 (D.N.J. 2008) ........................................................... 19

*Price v. Nat'l Bd. of Med. Exam'rs*,
966 F. Supp. 419 (S.D. W.Va. 1997) ..................................................... 23, 25

*Reichert v. Elizabethtown Coll.*,
2012 WL 1205158 (E.D. Pa. 2012) ........................................................... 33

*Ridley Sch. Dist. v. M.R.*,
-- F.3d -- 2012 WL 1739709 (3d Cir 2012) .................................................. 27

*Rumbin v. Ass'n of Am. Med. Coll.*,
803 F. Supp. 2d 83 (D. Conn. 2011) ......................................................... 24

*Schneider v. Shah,*
2012 WL 1161584 (D.N.J. 2012)..................................................................20

*Seibert v. Quest Diag. Inc.,*
2012 WL 1044308 (D.N.J. 2012)..................................................................19

*Shamonsky v. Saint Luke's Sch. of Nursing,*
2008 WL 724615 (E.D. Pa. 2008)................................................................32

*Shultz v. Potter,*
142 Fed. Appx. 598 (3d Cir. 2005) ............................................................27

*Singh v. George Wash. Univ. Sch. of Med. and Health Sci.,*
508 F.3d 1097 (D.C. Cir. 2007) ..........................................................22, 24

*U.S. ex rel. Josenske v. Carlisle HMA, Inc.,*
554 F.3d 88 (3d Cir. 2009)..........................................................................12

*Verzeni v. Potter,*
109 Fed. Appx. 485 (3d Cir. 2004) ............................................................27

*Victor v. State,*
203 N.J. 383 (N.J. 2010) ......................................................27, 28, 29, 32, 33

*Viscik v. Fowler Equipment Co.,*
173 N.J. 1 (N.J. 2002) ................................................................................25

*Wagner by Wagner v. Fair Acres Ger. Ctr.,*
49 F.3d 1002 (3d Cir. 1995)............................................................26, 29, 30

*Walton v. Mental Health Ass'n,*
168 F.3d 661 (3d Cir. 1999)........................................................................31

*Wandsworth London Borough Council v D'Silva,*
[1998] IRLR 193 at p. 8 (Ct. App. Civ. Div.).................................................38

*Weisberg v. Riverside Tp. Bd. of Educ.,*
180 Fed. Appx. 357 (3d Cir. 2003) ............................................................23

*Wong v. Regents of Univ. of Cal.,*
410 F.3d 1052 (9th Cir. 2005)................................................................21, 22

*Wynne v. Tufts Univ. Sch. of Med.*,
976 F.2d 791 (1st Cir. 1992) ................................................................. 32, 34

**STATUTES & REGULATIONS**

29 U.S.C. § 705 ................................................................................. 21

29 U.S.C. § 794 ...................................................................... 12, 13, 14

42 U.S.C. § 12112 ............................................................ 12, 15, 16, 21

42 U.S.C. §§ 12181-12189 ......................................................... 14, 16

N.J. Stat. 10:5-3 .............................................................................. 19

N.J. Stat. 10:5-5 ....................................................................... 20, 25

28 C.F.R. § 35.130 ......................................................................... 33

29 C.F.R. § 1630.2 ......................................................................... 21

29 C.F.R. § 1630.9 ......................................................................... 27

34 C.F.R. § 104.44 ......................................................................... 33

45 C.F.R. § 84.3 ............................................................................. 22

FED. R. CIV. P. 56 ........................................................................... 12

Fed. R. Civ. P. 12 .......................................................................... 17

**OTHER AUTHORITIES**

*U.S. Dep't of Justice Letter re: Access Abroad,* 17 Nat'l Disability L. Rep. (Lab.
Rel. Press)  262 (July 29, 1999)  ................................................... 17

*Re: Ariz. State Univ.,*
Case No. 08012047 (Dep't of Educ., Dec. 3, 2001) ................................ 14, 16

## PRELIMINARY STATEMENT

This is a disability discrimination case, alleging a failure to reasonably accommodate. Plaintiff Katherine Archut ("Archut") claims that Defendant Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited[1] ("Ross") did not reasonably accommodate her learning impairment at its veterinary school in the Federation of St. Kitts & Nevis ("St. Kitts"). Her claims fail for two reasons.

First, the challenged conduct wholly occurred within St. Kitts, a foreign country. But, in the public accommodations context, the Rehabilitation Act ("RHA") and Americans with Disabilities Act ("ADA") do not extend beyond U.S. borders. Similarly, the New Jersey Law Against Discrimination ("NJLAD") only reaches activity within New Jersey, or, arguably, that affects New Jersey residents. None of these statutes covers Archut, a West Virginia resident who sought disability accommodations in a foreign country. Thus, Archut's statutory claims all fail as a matter of law.

Second, even if these statutes somehow apply extraterritorially, Archut's claims fail on the merits. Archut has a learning disorder. But she is not statutorily "disabled," because she is not substantially limited in any major life activity. And, although not bound by the RHA, ADA, or NJLAD, Ross

---

[1] Incorrectly named as "Ross School of Veterinary Medicine."

still did what those statutes require.  In this regard, the crux of Archut's claims

is that Ross denied her a "reasonable accommodation" because it refused to

provide a live person to read tests to her while she took them (a "live reader").

But Archut only documented needing an "audio accommodation," not a live

reader.    And Ross provided her with a perfectly reasonable "audio

accommodation": tape recorded exams, read by her professors, which Archut

could rewind and replay and often as she liked.

     Additionally, through the interactive process, Ross exerted every effort

to reasonably accommodate Archut.  When Archut requested extra time and a

quiet room on her exams, Ross said "ok."  When Archut later provided support

for an "audio accommodation," Ross arranged for her professors to tape record

her exams.  When Archut then complained that the questions were read too

fast, Ross contacted each of Archut's professors, and asked them to read

slower.  And when Archut flunked out after just one semester, Ross readmitted

her and offered to let her retake her failed classes -- with the benefit of having

the tape recorded exams the entire semester.

     In short, Ross did everything but offer Archut a live reader -- a specific

accommodation that Archut never medically documented, and that would have

imposed severe hardships on Ross' operations.    Because of these facts,

Archut's discrimination claims fail on the merits.

Archut also asserts a breach of contract claim.  This cause of action is baseless, because Ross never contractually agreed to provide a live reader.

Thus, summary judgment should be granted in its entirety.

### STATEMENT OF FACTS

Plaintiff Katherine Archut is a Virginia native who attended college in West Virginia at West Virginia University ("WVU").  *See* Defendants' Rule 56.1 Statement ("Rule 56.1 Stmt.") at ¶ 14.

Archut started at WVU in Fall 2003.  *Id.* at ¶ 23.  That semester, she did poorly in many math and science classes, receiving Ds in Introduction to Chemistry and College Algebra, and a C+ in General Biology.  *Id.* at ¶ 14.

After that semester, Archut was tested for a learning impairment.  *Id.* at ¶ 24.   The test diagnosed certain "processing" impairments, but did not conclude that Archut's overall learning ability was significantly limited compared to an average person's.  *Id.* at ¶ 26.  And Archut contends that her condition "has nothing to do with [her] ability to learn and retain information."  *Id.* at ¶ 27.  It's just that, the way her "brain works," it processes "audio" information "a little better" than written words.  *Id.* ¶ 27.

In any event, based on the test results, WVU began permitting Archut extra test time, a quiet room, and use of a calculator.  *Id.* at ¶ 28.  In her fifth semester, WVU also started providing a live reader in some classes.  *Id.* at ¶ ¶

- 3 -

29.  In Spring 2007, for instance, WVU provided a live reader only for one test in one class.  *Id.* at ¶ 30.  WVU provided the live reader by having a professor or professor's assistant read the exams to Archut.  *Id.* at ¶ 29.

Despite these accommodations, Archut's math and science grades did not improve much.  Archut still received a C- in Introductory Physiology, Cs in Plane Trigonometry, Introduction to Animal Physiology, Principles of Genetics, and General Microbiology, and a C+ in General Biology.  *Id.* at ¶ 34.  She also withdrew from Organic Chemistry I and Organic Chemistry II, taking them at a community college.  *Id.* at ¶ 34.  And, while studying abroad in Australia, Archut also failed an animal diversity class.  *Id.* ¶ 35.

Archut's academic performance did somewhat improve though.  In a conversation with her father, Archut attributed her higher grades to receiving extra examination time as an accommodation.  *Id.* at ¶ 36.

For veterinary school, Archut applied to UC Davis, Virginia Tech, Maryland Regional College, University of Florida, Oregon State, and a school in Mississippi.  *Id.* at ¶ 38. After being rejected by these schools, and while still at WVU, Archut applied to Ross.  *Id.* at ¶ 39.  Ross accepted her.

On December 11, 2007, Rebecca Berger from WVU wrote Bill Bingham at Ross about Archut's learning impairment.  *Id.* at ¶ 42. Berger stated that WVU provided Archut with several accommodations, including

"extra time for tests," and "the ability to tape record lectures." *Id.* at ¶ 42. She did not mention the live reader accommodation. *Id.* at ¶ 43.

Ross's student orientation took place on January 2, 2008. During orientation, Archut filled out a Personal Data Form that asked about disabilities. *Id.* at ¶ 45. Archut reported that she had dyslexia[2] and required "extra time on exams." *Id.* She did not request a live reader. *Id.*

Ross's Student Counselor, Elpida Artemiou, reviewed Archut's Personal Data Form. *Id.* at ¶ 49. On January 9, Artemiou emailed Archut to ask if she wanted accommodations. *Id.* at ¶ 49. Artemiou also sent Archut a copy of Ross's reasonable accommodations policy, which makes clear that requests need to be supported by a "psycho-educational report." *Id.* at ¶ 50.

On January 10, Archut filled out a Disability Services Request form. *Id.* at ¶ 51. On this form, Archut wrote that she suffered from "Dyslexia / Learning Disability." *Id.* She sought extra exam time, and an exam room with minimal distractions. *Id.* Identifying accommodations she received before, Archut wrote "100% extra time on exams." *Id.* On a handwritten note, Archut added that she had "some test orally" and "read to" her. *Id.* at ¶ 53. But Archut did not actually request an audio accommodation. *Id.* at ¶ 52. She just asked to "take examinations a little slower." *Id.* at ¶ 53.

---

[2] Archut's psychological report does not use the term "dyslexia." *Id.* at ¶ 25.

Archut met with Artemiou in early January, and asked for additional exam time and a quiet room.  *Id.* at ¶¶ 51, 57.  Much like on her Disability Services Request form, Archut also mentioned the live reader, but did not specifically request one.  *Id.* at ¶ 52.  Artemiou told Archut that she needed to provide documentation to support the requested accommodations.  *Id.* at ¶ 58.

On January 14, Artemiou asked Archut to have WVU send her disability documentation directly to St. Kitts.  *Id.* at ¶ 59.  The next day, Artemiou received Berger's December 11 letter, which mentioned some of Archut's WVU accommodations, but did not medically document them, nor mention the live reader.  *Id.* at ¶¶ 42-44, 60.  After receiving this letter, Artemiou emailed Archut to inform her that she was now on the approved list for testing accommodations.  *Id.* at ¶ 60.  These accommodations were extra time on examinations, and a quiet room with minimal distraction.  *Id.* at ¶ 60.  Archut's first exam was still 10 days away.  *Id.* at ¶ 63.

In this email, Artemiou also told Archut that Berger's "letter indicated that you will be providing me with . . . your most recent documentation," and gave Archut six weeks to supply it, during which she would receive extra time and a quiet room.  *Id.* at ¶¶ 60-61.  On January 18, Artemiou followed up, reminding Archut that she had only received Berger's letter and still needed Archut's "evaluation reports." *Id.* at ¶ 62.

Archut and WVU apparently had a miscommunication about who would supply Ross with Archut's documentation.  Archut thought that Berger would send it in, or had already sent it.  *Id.* at ¶ 64.  Berger, on the other hand, assumed Archut would send it herself.  *Id.* at ¶ 65.  Because of this mix-up, no documentation reached Ross until mid-February.  *Id.* at ¶ 67.

In late-January, Archut took her first exams.  *Id.* at ¶ 64.  She failed most of them.  *Id.* at ¶ 63.  After those exams, Archut claims she spoke with Artemiou about receiving a live reader.  *Id.* at ¶ 66.[3]  Archut told Artemiou that she "didn't have documentation," and was "still working on how to accommodate . . . a request like this."  *Id.* at ¶ 66.

On February 14, Berger finally sent Ross a copy of Archut's April 8, 2004 Psychological Evaluation.  *Id.* at ¶ 67.  This evaluation indicated that Archut had "difficulty with her processing of symbolic language," and "slow visual motor speed, which would result in needing longer time to write responses on exams."  *Id.* at ¶ 68.  But it did not recommend any specific accommodations.  *Id.* at ¶ 70.  Nor, at the time, did Berger supply anything else supporting a reader accommodation.  *Id.* at ¶ 71.  Archut acknowledges that

---

[3] It is unclear when Archut first requested a reader.  Emails suggest that Archut waited until February 27th.  *Id.* at ¶ 74.  Archut's testimony suggests an early February date.  *Id.* at ¶ 66.  Regardless, this dispute is not material.  So, for this motion's purposes, Ross credits Archut's version of events.

Berger and WVU made this mistake, not Ross. *Id.* at ¶ 72.

On February 27, Archut emailed Dr. N. Sean Fox, the Associate Dean for Student Life, telling him that she "had the majority of [her] exams read to" her at WVU,[4] and asking that "something" be "done to help me here." *Id.* at ¶ 75. Archut's father, Dan Wright, made a similar request of Dr. Fox that day. The next day, Dr. Fox wrote Archut and offered to meet with her on Monday, March 3. *Id.* at ¶ 78. They met on March 4. *Id.* at ¶ 78.

On March 17, Artemiou emailed Archut to let her know that Ross still had not received her documentation. *Id.* at ¶ 79. On March 21, Artemiou followed up to clarify that Ross "ha[d] not received any documentation regarding [her] request for a test reader." *Id.* at ¶ 80.

Ross finally received Archut's documentation on March 25. *Id.* at ¶ 86. That day, Berger sent Ross a "brief letter" from Dr. Daniel G. Long, II, Ph.D, which Dr. Long drafted in response to Archut's "struggle[s]" at Ross. *Id.* at ¶ 82. Dr. Long wrote that "an audio accommodation would be warranted given" Archut's "constellation of difficulties." *Id.* at ¶ 83. But Dr. Long did not specify what form this "audio accommodation" needed to take. *Id.* at ¶ 84. Thus, Dr. Long neither recommended a live reader, nor indicated that a live

---

[4] In fact, Archut had no tests read to her until her fifth semester at WVU, and then received a reader only on some tests, in some classes. *Id.* at ¶¶ 29-30.

reader would provide more efficacy than tape-recorded tests. *Id.*

On March 28, Artemiou emailed Archut to inform her that, because she had provided "support for an audio accommodation," Ross would arrange to have test "questions tape recorded," so that she could "listen to each question as many times as [she] wish[ed]," during the exam. *Id.* at ¶ 87.

Ross had several reasons for offering Archut a tape-recorded exam instead of a live reader. *Id.* at ¶ 88. To begin, Ross could not have simply dragged someone in off the street to serve as a reader. Ross needed to ensure that obscure, technical veterinary terms were pronounced correctly. *Id.* at ¶ 88. Indeed, when the Program for the Assessment of Veterinary Education Equivalence ("PAVE") provides live readers on certification tests, it flies in retired veterinarians for precisely this purpose. *Id.* at ¶ 89.

Flying in veterinarians for every test would be extremely costly. *Id.* at ¶ 96. And, unlike WVU, Ross did not employ professor's assistants who knew the vocabulary well enough to be readers. So Ross concluded that only Archut's professors could read the exams. *Id.* at ¶ 91. But, during tests, Archut's professors were unavailable as live readers, because Ross needed them to proctor the exam for the rest of the class. *Id.* at ¶ 93. Having Archut's professors tape-record her tests solved this dilemma.

Ross also wanted to ensure that Archut didn't have an advantage over

other students. *Id.* at ¶ 95. Ross feared that, if Archut's professors served as live readers, they might unwittingly supply nonverbal cues pointing towards the right answer on multiple choice tests. *Id.* at ¶ 95. Tape-recorded exams resolved this issue as well. *Id.* at ¶ 102.

When Ross began providing Archut with tape recorded tests, she still had one midterm left, plus all her final exams, which were weighted more heavily. *Id.* at ¶ 102. Archut received a tape-recording of each course's professor reading the exam, plus headphones. *Id.* at ¶ 103. She could stop, pause, and rewind the tape, enabling her to listen to the test questions as many time as she liked. *Id.* at ¶ 103.

On April 8, Archut emailed Artemiou to inform her that, although "the recording for the last exam was fine," the reader "read the questions too fast." *Id.* at ¶ 104. Archut asked the questions to be read "much slower," and for a pause between questions. *Id.* at ¶ 104. Overall though, Archut found the recording only "slightly different than a live reader" and "kn[e]w this audio will desperately help" *Id.* at ¶ 104.

On April 9, Artemiou told the professor who read the last examination, Aaron Horowitz, to "please read the questions slower and pause in between each question." *Id.* at ¶ 105. Artemiou then made similar requests to Archut's other professors. *Id.* at ¶ 106. As a result, Archut's final examinations were

read slower than the first exam. *Id.* at ¶ 107. In fact, her final exams were read so slow that Archut considered them "unbelievably slow." *Id.* at ¶ 107.

Despite receiving the tape recordings as an audio accommodation, Archut still failed Microscopic Anatomy & Embryology, Physiology, and Animal Nutrition. *Id.* at 108. She passed Anatomy with a C. *Id.* at ¶ 108. On April 19, Dr. Guy St. Jean, the Associate Dean for Academic Affairs, dismissed Archut from Ross for poor academic performance. *Id.* at ¶ 112.

On May 2, Archut appealed her dismissal. *Id.* at ¶ 113. On May 7, Dr. St. Jean granted Archut's appeal, allowing her to be readmitted to Ross. *Id.* at ¶ 114. Dr. St. Jean told Archut that, upon readmission, she would receive extra exam time, a quiet room, and tape-recorded exams. *Id.* at ¶ 115. Ross also informed Archut that, if she retook her first year, it would replace her original grades. *Id.* at ¶ 116. Archut would only need to retake the classes she failed. *Id.* at ¶ 117. She wouldn't need to retake Anatomy or pay for this class because she passed it the first time around. *Id.*

On June 16, 2008, Archut wrote Dr. St. Jean to inform him that she would not return to Ross. *Id.* at ¶ 118.

Archut never provided Ross with documentation explaining either why the tape recorded examinations were insufficient to accommodate her disability, or why she specifically needed a live reader. *Id.* at ¶ 121.

## STANDARD OF REVIEW

Summary judgment is proper if there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).   The Court views the record in the light most favorable to the non-moving party, drawing inferences in that party's favor. *See U.S. ex rel. Josenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009)

## ARGUMENT

**I.     The ADA, RHA, and NJLAD Do Not Apply Extraterritorially To Public Accommodations, Such as Universities**

### A.     Summary of Argument

Archut alleges discrimination under the RHA, the ADA, and the NJLAD.  But these statutes do not extend extraterritorially to cover Archut's claims. The RHA applies only "in the United States." 29 U.S.C. § 794(a).  The ADA can reach abroad, but <u>only</u> to protect American citizens <u>employed</u> by American-controlled employers.   42 U.S.C. § 12112(c)(2)(A).   It does not cover students, such as Archut.  As for the NJLAD, it does not stretch beyond New Jersey except, arguably, for claims asserted by New Jersey residents.  Yet Archut was a West Virginia citizen who resided in St. Kitts.

### B.     The Alleged Discrimination Occurred Entirely Within St. Kitts

It is undisputed that the alleged discriminatory conduct occurred wholly within St. Kitts.  Archut attended Ross, a foreign university organized under St.

- 12 -

Kitts law and accredited by the St. Christopher & Nevis Accreditation Board. Rule 56.1 Stmt. at ¶ 4.  She studied at its only campus, which is also in St. Kitts.  *Id.* at ¶ 16.  She complains exclusively about accommodations she did not receive on tests she took in St. Kitts.  *Id.* at ¶ 18.  The people who allegedly denied these accommodations -- Artemiou, Dr. Fox, Dr. Burns and Dr. St. Jean, all live and work in St. Kitts.  *Id.* at ¶ 18.  And every action they took, they took while on St. Kitts.  *Id.* at ¶ 18.

Thus, for Archut to have viable RHA, ADA, or NJLAD claims, these statutes must apply extraterritorially.  In Archut's case, they do not.

C.       The RHA Act Does Not Apply Extraterritorially

Count I of the Complaint asserts a claim under § 504 of the RHA, 29 U.S.C. § 794(a).  But Section 504 has no extraterritorial application.

"It is a longstanding principle" of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869, 2877-78 (2010).  Thus, "unless there is the affirmative intention of the Congress clearly expressed" to give a statute extraterritorial effect, "it has none." *Id.*

Section 504 contains no clear indication of an extraterritorial application.  To the contrary, on its face, § 504 limits its application to the

United States, because it protects only "otherwise qualified individual[s] with a disability in the United States." 29 U.S.C. § 794(a).

Given this statutory text, the Department of Education, Office of Civil Rights ("OCR") has opined that § 504 does not "extend extraterritorially" to cover Americans in "Study Abroad Program[s]" operated by American universities. *Re: Ariz. State Univ.,* Case No. 08012047 (Dep't of Educ., Dec. 3, 2001) (Exhibit II to the Declaration of Howard Wexler ("Wexler Decl.")). Nor does § 504 "otherwise prohibit discrimination on the basis of disability in overseas programs." *Id.* And the OCR's opinion must be shown the "respect" owed to all agency interpretations. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000).

It follows then that § 504 does not cover Archut's claims. Archut was not a "qualified individual with a disability in the United States," because she was *not* "in the United States" when at Ross. And, if § 504 does not cover an *American* college's overseas programs, then it certainly does not regulate overseas programs operated by a *foreign* university, such as Ross, even if Ross receives administrative support from U.S. offices.

D.     The ADA

Count II of Archut's Complaint alleges disability discrimination under Title III of the ADA, 42 U.S.C. §§ 12181-12189. This Count also fails as a

matter of law, because Title III also does not apply extraterritorially.

Back in 1991, the Supreme Court addressed whether a related employment statute, Title VII of the Civil Rights Act, applied extraterritorially to regulate American employers who employ Americans abroad. *See EEOC* v. *Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*"). Applying the "longstanding principle" that statutes do not apply extraterritorially unless Congress expressly says so, the Supreme Court held that Title VII did not apply beyond U.S. borders. *Id.* at 248.

Responding to *Aramco*, Congress amended both Title VII and the ADA to "provide for limited extraterritorial application." *Asplundh Tree Expert Co., v. NLRB*, 365 F.3d 168, 180 (3d Cir. 2004). However, as to the ADA, Congress amended only Title I, which concerns employment discrimination. *See* 102 P.L. 166, § 109. Congress did not amend Title III, which covers public accommodations such as private universities.

As a result, the ADA's extraterritorial provisions merely provide that "If an ***employer*** controls a corporation whose place of incorporation is a foreign country, any practice that constitutes discrimination ***under this section*** . . . shall be presumed to be engaged in by such ***employer***." 42 U.S.C. § 12112(c)(2)(A) (emphasis supplied). Likewise, Section 12112, the "section" referred to in § 12112(c)(2)(A), only prohibits disability discrimination "in regard to job

- 15 -

application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, or privileges of employment." 42 U.S.C. § 12112(a). "[T]his section" does not prohibit discrimination in public accommodations. Rather, discrimination in public accommodations is covered by Title III, which - as discussed above - contains no clauses providing for extraterritorial effect. *See* 42 U.S.C. §§ 12181-12189.

Recognizing these facts, the Central District of California held that the ADA's public accommodations provisions do not apply extraterritorially. *Loving v. Princess Cruise Lines, Ltd*, 2009 U.S. Dist. LEXIS 130477, at *21-24 (C.D. Cal. 2009). *Loving* noted that Title III "does not contain any express provisions extending its application to extraterritorial activities." *Id.* at *22. By itself, this precludes applying Title III abroad, because Supreme Court precedent compels a "presumption" against extraterritoriality. *Id.*

Furthermore, the ADA's legislative history "supports the conclusion that Congress did not intend Title III to apply extraterritorially." *Id.* at *24. After all, when Congress responded to *Aramco* by amending Title I, it "did not enact a comparable amendment to Title III of the ADA." *Id.* at *23.

Two agency opinion letters bolster *Loving*'s rejection of extraterritoriality. *See Re: Ariz. State Univ.*, Case No. 08012047 (ADA does not "prohibit discrimination on the basis of disability in overseas programs" run

by public colleges); *See* U.S. Dep't of Justice Letter re: Access Abroad, 17 Nat'l Disability L. Rep. (Lab. Rel. Press) ¶ 262 (July 29, 1999) (Title III of ADA likely does not apply abroad) (Wexler Decl., Ex. JJ).  And these interpretations must be shown "respect."  *See Christensen*, 529 U.S. at 587.

Archut may argue that an unreported slip opinion in a case involving Ross supports a contrary result.  *See Dean-Hines v. Ross Univ. Sch. of Vet. Med.*, 05-CV-3486, Docket No. 30 (D.N.J. Aug. 10, 2006).  She is wrong.

*Dean-Hines* was not a decision on the merits.  In *Dean-Hines*, the Court merely considered extraterritoriality as a question of "subject matter jurisdiction," under Rule 12(b)(1), and thus applied a jurisdictional analysis that focused on the dispute's "contacts" with the United States.  *See id.* at pp. 5-8.  Finding, based on the pleadings, that the United States had a "significant contact" with the dispute, the Court concluded that it had subject-matter jurisdiction to hear the case.  *Id.* at p. 8.

The *Dean-Hines* approach to extraterritoriality may, arguably, have been correct in 2006.[5]  But it no longer is.  In *Morrison*, 130 S.Ct. at 2877, the Supreme Court pronounced that a statue's extraterritorial application does not

---

[5]  Even this is unclear.  *Dean-Hines* set forth that "[q]uestions of extraterritorial application and congressional intent under the ADA" were "irrelevant." *Id.* at 8.  But prior Supreme Court precedent made clear that, in interpreting a statute to see whether it applies abroad, Congressional intent is not "irrelevant"; it is paramount. *Aramco*, 499 U.S. at 248.

- 17 -

"raise a question of subject-matter jurisdiction." Rather, extraterritoriality goes only to "what conduct [the statute] reaches" and thus, what it "prohibits, which is a merits question." *Id.* It does not affect subject-matter jurisdiction, because it does not concern "a tribunal's power to hear a case." *Id.* (citations and quotations omitted).

The appropriate inquiry, then, concerns whether Congress "clearly expressed" its "affirmative intention" to legislate abroad. *Id.*; *see also Animal Sci. Prod., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 467-68 (3d Cir. 2011). It is not looking at whether a dispute has sufficient "contacts" with the United States to invoke the Court's subject matter jurisdiction.

But even if *Dean-Hines*'s "contacts" approach is still, or ever was, viable, *Dean-Hines* is still distinguishable. On the pleadings, *Dean-Hines* found a "significant contact" with the U.S. Here, based on the undisputed evidence, no "significant contacts" exist. Archut studied in St. Kitts at a St. Kitts university, and sought accommodations for tests she took in St. Kitts, from people who lived and worked in St. Kitts.

E.     The NJLAD

Count III of the Complaint asserts disability discrimination under the NJLAD. Much like the ADA, the NJLAD has limited extraterritorial reach. In employment, the NJLAD applies "only to New Jersey employees or, in limited

circumstances, to an employer's alleged wrongdoing directed at or committed in the State." *Papalini v. Sensient Colors, Inc.*, 2012 WL 1345353, at *3 (D.N.J. 2012) (citing cases). "This restriction on the extraterritorial application of the NJLAD is rooted in the well-settled understanding that New Jersey law regulates conduct in New Jersey, not outside the state." *Id.* (quoting *Peikin v. Kimmel & Silverman, P.C.*, 576 F. Supp. 2d 654, 657 (D.N.J. 2008)).

Recognizing the NJLAD's limited reach, courts frequently dismiss NJLAD claims brought by plaintiffs who did not principally work in New Jersey. *See, e.g., Papalini*, 2012 WL 1345353, at *4 (dismissing claim even though employee's assigned territory included New Jersey). And they do so **even** when the defendant has a New Jersey headquarters. *See Seibert v. Quest Diag. Inc.*, 2012 WL 1044308, at *3 (D.N.J. 2012); *Brunner v. AlliedSignal, Inc.*, 198 F.R.D. 612, 613-14 (D.N.J. 2001).

This authority finds strong support in the NJLAD's statutory text. The NJLAD reflects that the New Jersey legislature's concerns were limited to New Jersey "inhabitants." N.J. Stat. 10:5-3. And, in defining a public accommodation, the NJLAD limits its reach to educational institutions "under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey." N.J. Stat. 10:5-5(l).

Here, Archut was never a New Jersey "inhabitant." She was a West

Virginia inhabitant, who then resided in St. Kitts.   And she suffered no discrimination in New Jersey.   Rather, she alleges that Ross, a St. Kitts university, denied her accommodations in St. Kitts.   Finally, Ross is not supervised by either the New Jersey State Board of Education, or the Commissioner of Education of the State of New Jersey.  Rule 56.1 Stmt. ¶ 5.

It follows then that the NJLAD does not cover Archut's claims.   So Ross is entitled to summary judgment on Count III as well.

## II.   **Archut's Discrimination Claims Also Fail On Their Merits**

### A.   Summary Judgment Framework

It is not yet settled whether the *McDonnell-Douglas* burden-shifting framework applies to summary judgment motions in public accommodations claims.  *Compare Cottrell v. Good Wheels*, 458 Fed. Appx. 98, 101 (3d Cir. 2012) (affirming decision that applied *McDonnell-Douglas*) with *Schneider v. Shah*, 2012 WL 1161584, at *2 (D.N.J. 2012) (using a different standard).   But whether *McDonnell-Douglas* applies is immaterial.  In failure to accommodate claims, *McDonnell-Douglas* mostly impacts who has the initial burden of either establishing or defeating a *prima facie* case.  Here, regardless of who bears that initial burden, the evidence irrefutably shows that Archut cannot present a *prima facie* case.

For, to establish a *prima facie* case of disability discrimination under

- 20 -

the ADA, RHA, or NJLAD, Archut must show that she: (1) has a disability; (2) is "otherwise qualified" to participate in the program; and (3) was denied the program's benefits or was otherwise subject to discrimination because of her disability. *See Millington v. Temple Univ. Sch. of Dent.*, 261 Fed. Appx. 363, 365 (3d Cir. 2008) (ADA and RHA); *D.G. Somerset Hills Sch. Dist.*, 559 F. Supp. 2d 484, 502-03 (D.N.J. 2008) (applying ADA standards to NJLAD). And here, Archut cannot meet any of those prongs.

### B.       Archut Is Not "Disabled"

#### i.       The ADA & RHA

Under the ADA and RHA a "[d]isability" means "a physical or mental impairment that substantially limits one or more . . . major life activities." 42 U.S.C. § 12102(2)(A)-(C); 29 U.S.C. § 705(9)(B) (incorporating the ADA's definition into the RHA); *Millington*, 261 Fed. Appx. at 365.

Here, Archut contends she has a "mental impairment," based on her difficulty processing "symbolic language." Rule 56.1 Stmt. ¶ 68; 29 C.F.R. § 1630.2(h). But even assuming that Archut's difficulties qualify as a "Learning Disorder," *id.* at ¶ 69, or, in everyday English, a "learning disability," this does not make her "disabled" under the ADA or RHA.

Not every "learning disability" is a statutory "disability." *Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1066 n. 6 (9th Cir. 2005) (a "person

who has a 'learning disability' is not necessarily 'disabled' under the [RHA and ADA]"); *Singh v. George Wash. Univ. Sch. of Med. and Health Sci.*, 508 F.3d 1097, 1099-1101 (D.C. Cir. 2007) (dyslexia and "mild disorder of processing speed" not disabilities); *Love v. Law Sch. Admission Council, Inc.*, 513 F. Supp. 2d 206, 226 (E.D. Pa. 2007) ("the fact that Plaintiff is clinically diagnosed as having a learning impairment does not automatically mean that he is entitled to an accommodation under the ADA"). To be "disabled" a person "has to be substantiality limited in a major life activity, and that is measured by 'most people's daily lives,' not unique needs of a particular position." *Wong*, 410 F.3d at 1066 n. 6. For this reason, although the "term 'learning disability' is commonly used," it "can be misleading" in disability discrimination cases. *Id.*

No evidence supports that Archut is "substantially limited" in any "major life activities." For instance, despite her claimed learning impairment, Archut does not contend that she's substantially limited in "learning." 45 C.F.R. § 84.3. On the contrary, Archut adamantly insists that her impairment "has nothing to do with [her] ability to learn." Rule 56.1 Stmt ¶ 27. Likewise, Archut has consistently represented that she learned the material she studied at Ross "exceptionally well," "understand[ing] everything," "backwards, forwards, and sideways," "inside and out," enough to "ace any essay exam or verbal exam," or ably discuss the material "all day long." *Id.* at ¶ 109. These

admissions refute that Archut "is unable to learn in comparison to the average person." *Palotai v. Univ. of Md.*, 38 Fed. Appx. 946, 955 (4th Cir. 2002); *Price v. Nat'l Bd. of Med. Exam'rs*, 966 F. Supp. 419, 426-27 (S.D. W.Va. 1997) (dyslexia is not a disability if it "does not restrict [a student's] ability to learn as compared with most people").

Archut may contend that she's substantially limited in "reading." *Love*, 513 F. Supp. 2d at 226. Again, the evidence refutes any such suggestion. Archut rates her own "reading ability" as "good." Rule 56.1 Stmt. ¶ 46. She reads "20 plus" books "for leisure per year." *Id*. At both WVU and Ross, she completed assigned class readings. *Id.* at ¶¶ 37, 110. And, although she received 25% more assigned reading at Ross, *id.* at ¶ 110, she does not claim that this extra reading caused her difficulties. It did not, after all, prevent her from learning "the stuff inside and out." *Id.* at ¶ 109.

At most, a psychological exam measured Archut's reading ability in the "Low average range." But "Low average range" is still within the "average range." It is not "substantially limited." *See Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 629-630 (6th Cir. 2000) (plaintiff who scored "within the average range on reading comprehension tests" not "substantially limited" in reading). Indeed, even someone who is "below average" in reading is not "substantially limited." *Weisberg v. Riverside Tp. Bd. of Educ.*, 180 Fed. Appx.

357, 358-59 (3d Cir. 2003).   After all, if "merely being 'below average'" in "reading comprehension" qualified as disabled, then "roughly half the population of the United States [is] 'disabled.'"  *Id.* (recounting district court's reasoning and affirming "essentially for the reasons given by the District Court").   Thus, a plaintiff who placed in the 25th percentile in "reading comprehension" faced "only certain narrow and relatively minor limitations" in his life, not "substantial" limitations.  *Id.* at 362; *see also Love*, 513 F. Supp. 2d at 219, 228 (plaintiff with poor reading "processing speed" was not "substantially limited").

Archut may also contend that she's substantial limited in "test taking." Indeed, Archut claims that her academic problems derived from not "being able to accurately show [her] knowledge" on "multiple choice" tests.   Rule 56.1 Stmt. ¶ 111.  But "test-taking is not a major life activity."[6]  And, "[i]f a court were to grant testing accommodations to persons that do not have [statutory] disabilities . . . it would allow persons to advance to professional positions through the proverbial back door."  *Price*, 966 F. Supp. at 422.

It follows then that Archut is not "disabled" within the meaning of the

---

[6] *Singh*, 508 F.3d at 1104; *Rumbin v. Ass'n of Am. Med. Coll.*, 803 F. Supp. 2d 83, 94 (D. Conn. 2011); *Meisenhelder v. Fla. Coastal Sch. of Law, Inc.*, 2010 U.S. Dist. Lexis 57736, at *11-13 (S.D. Fla. 2010); *Herzog v. Loyola Coll. of Md., Inc.*, 2009 U.S. Dist. Lexis 94454, at *17 n. 4 (D. Md. 2009); *Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F. Supp. 2d 42, 47 (D. Mass. 2005).

ADA or the RHA.  Thus, summary judgment is appropriate.

ii.      *The NJLAD*

The NLAD defines "disability" more broadly than the ADA or RHA.
However, even the NJLAD requires a "mental, psychological or developmental
disability" to either "prevent[] the normal exercise of any bodily or mental
function" or be "demonstrable . . . by accepted clinical or laboratory diagnostic
techniques." N.J.S.A. § 10:5-5(q).

Here, Archut's condition did not "prevent[] the normal exercise" of a
"bodily or mental function," because she learns and reads within the average
range.  *See supra* at 22-23.   And, while Archut was diagnosed with an
amorphous "Learning Disorder," there is no evidence that any bodily or mental
functions were meaningfully impaired.  *See Domurat v. Ciba Spec. Chem.
Corp.*, 801 A.2d. 423, 434 (N.J. Super. A.D. 2002) (plaintiff not disabled
despite "uncontroverted medical evidence" of attention-deficit disorder).  This
is fatal to her claim, because even diagnosed conditions must interfere with
"the normal exercise" of "bodily or mental functions."  *See Grubb v. Garbutt*,
2010 WL 3516847, at *4 (N.J. Super A.D. 2010) (no disability where
"medication" controlled condition).   Finally, "[w]here the existence of a
handicap is not readily apparent, expert medical evidence is required," because
the courts place "a high premium on . . . objective medical testimony."  *Viscik*

- 25 -

*v. Fowler Equipment Co.*, 173 N.J. 1, 16 (N.J. 2002).  But Archut has not

disclosed any experts who will testify about *whether* she has a physical or

mental disability.  Rule 56.1 Stmt. at ¶ 85.  Thus, as a matter of law, she cannot

meet this prong of her *prima facie* case.

    C.    Archut Is Not "Otherwise Qualified"

    An "otherwise qualified" individual is "one who can meet all of a

program's requirements in spite of his [or her] handicap." *Wagner by Wagner*

*v. Fair Acres Ger. Ctr.*, 49 F.3d 1002, 1009 (3d Cir. 1995).  Under this

approach, Archut is indisputably not "otherwise qualified," because she flunked

out of Ross.  Alternatively, an individual may be "otherwise qualified," even if

she "cannot meet all of a program's requirements" if "the refusal to modify an

existing program would be unreasonable and therefore discriminatory." *Id.*

The inquiry is "whether the person would be otherwise qualified if reasonable

accommodations are made." *Id.* at 1009.

    Under this framework, Archut is not "otherwise qualified" for three

reasons: (i) she rejected a reasonable accommodation (tape recorded exams);

(ii) the requested live reader was a wildly costly, unreasonable accommodation;

and (iii) Archut never documented needing a live reader.

        i.    *Archut Rejected An Offered Reasonable Accommodation*

    A plaintiff is not entitled to the specific accommodation she requests,

but only to a "reasonable accommodation."[7]   Thus, "[i]f more than one accommodation" is reasonable, a covered entity "has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." *Victor v. State*, 203 N.J. 383, 424 (N.J. 2010) (interpreting NJLAD based on applying federal standards).   Critically in Archut's case, after an "individual rejects a reasonable accommodation . . . the individual will not be considered qualified." 29 C.F.R. § 1630.9(d); *Shultz v. Potter*, 142 Fed. Appx. 598, 599 (3d Cir. 2005); *Verzeni v. Potter*, 109 Fed. Appx. 485, 489 n. 1 (3d Cir. 2004); *see generally Victor*, 203 N.J. at 406 (NJLAD's "reasonable accommodation" provisions follow RHA and ADA).

Here, Ross indisputably offered Archut a reasonable accommodation, which she rejected.   Three days after Archut supplied documentation for an "audio accommodation," Ross began providing her with tape-recorded tests, so that Archut could "listen to each question as many times as [she] wish[ed]." Rule 56.1 Stmt. at ¶ 87.  As a matter of law, these tape recordings qualify as a

---

[7] *E.g., Ridley Sch. Dist. v. M.R.,* -- F.3d -- 2012 WL 1739709, at *17 (3d Cir 2012); *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800–01 (6th Cir. 1996); *Diaz v. City of Phila.*, 2012 WL 1657866, at *12 (E.D. Pa. 2012);   *see also Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68 (1986) ("any reasonable accommodation by the employer is sufficient to meet its accommodation obligation," in the religious accommodation context).

"reasonable accommodation" because they fulfilled Archut's documented need to have information "presented auditorally." *Id.* at ¶ 83; *Victor*, 203 N.J. at 423 ("reasonable accommodation" means accommodating a *"physical disability,"* not "acquiesc[ing] to the disabled [individual's] requests"); *Mucci v. Rutgers*, 2011 WL 831967, at *22-23 (D.N.J. 2011) (take-home exam satisfied college's reasonable accommodation obligation because it "complied" with the psychologist's recommendations). And Archut herself considered the tape recordings only "slightly different than a live reader." Rule 56.1 Stmt. at ¶ 104.

Archut, conversely, has not adduced a single shred of evidence to suggest that the tape recordings did not reasonably accommodate her processing impairment. She has not, for instance, produced any reports suggesting that she only benefits from information "presented auditorially" during face-to-face conversations, and does not obtain this same benefit from tape recordings. To the contrary, Archut used tape recorders to help her study at both WVU and Ross. *Id.* at ¶ 122.

At most, Archut contends that the tape recordings were not perfect because the test questions were not read at the precise speed she wanted. But accommodations can be reasonable even if they are not "ideal." *Mastonicola v. Principi*, 2006 WL 3098763, at *5-6 (W.D. Pa. 2006); *Victor*, 203 N.J. at 424. And, in any event, Ross sought to make the recordings as useful to her as

possible.   To this end, when Archut asked that questions be read "much slower," Ross promptly contacted her professors to ask them to comply with Archut's wishes, and they did.   Rule 56.1 Stmt. at ¶¶ 104-106.   Then, when Archut still flunked out, Ross readmitted her so that she could benefit from the tape-recorded exams the entire next semester.   *Id.* at ¶¶ 114-115.   These additional accommodations provide even more support that Ross "reasonably accommodated" Archut's claimed disability.

   *ii.*  *The Live Reader Was An Unreasonable Accommodation*

  Archut is not "otherwise qualified" for another reason.   It is a plaintiff's burden to identify a reasonable accommodation.   *Fogelman v. Greater Hazleton Health All*, 122 Fed. Appx. 581, 585-586 (3d Cir. 2004).   Here, the live reader that Archut demanded was manifestly unreasonable.   *Wagner by Wagner*, 49 F.3d at 1009 (a person is only "otherwise qualified" if a "reasonable accommodation" can ameliorate the handicap).

  Indisputably, Ross had only two options for supplying a live reader: (1) conscripting Archut's professors for this task; or (2) like PAVE does for certification exams, flying in retired veterinarians every time Archut took a test.   *See* Rule 56.1 Stmt. ¶ 92.   This is because Ross could not have dragged in anyone off the street to serve as a live reader.   *Id.* at ¶¶ 92-93.   Ross could only have used someone familiar with the complicated, technical nature of

veterinary vocabulary. *Id.* at ¶ 91. And unlike WVU, Ross does not employ professor's assistants with sufficient familiarity. *Id.* at ¶ 92.

Conscripting Archut's professors as live readers was unreasonable, because it would have "fundamentally modfi[ed]" Ross's program. *Wagner by Wagner*, 49 F.3d at 1009. While Archut took her tests in a quiet room, her professors were proctoring the exam for the rest of her class. *Id.* at ¶ 93. Using professors as proctors served important educational ends, including safeguarding the "integrity of the testing process." *Forbes v. St. Thomas Univ., Inc.*, 2011 U.S. Dist. Lexis 57965, at *7 (S.D. Fla. 2011) ("logistical factors about proctoring exams" supported denying accommodations). Thus, if professors could not proctor exams because they instead spent the exam period with just a single student, the rest of the class would suffer.

But even if Archut's professors were not otherwise occupied, using them as live readers would still be unreasonable. Ross feared that professors who served as live readers might give off subtle non-verbal clues pointing to the right answer, giving Archut an unfair advantage. *Forbes*, 2011 U.S. Dist. Lexis 57965, at *7 ("fairness to other students" supported denying accommodations); *see also Meisenhelder*, 2010 U.S. Dist. Lexis 57736, at *15-16 (digitally recording classes was not a reasonable accommodation because it "would fundamentally alter" the educational program).

- 30 -

Based on these factors, Ross concluded, in its professional judgment, that using Archut's professors as live readers would have "fundamentally alter[ed] the nature of the school's program." *See Millington*, 261 Fed. Appx. at 367. And this assessment must be "viewed with the deference ordinarily afforded educational institutions for decisions relating to their academic standards." *id.*; *Halpern v. Wake Forest Univ. Health Sci's*, 669 F.3d 454, 463 (4th Cir. 2012) (the court should "accord great respect" to a university's "professional judgments" on "whether [a student's] proposed accommodations would effect substantial modifications") (collecting cases from the First, Second, Fifth, Seventh, Eighth, and Ninth Circuits).

Alternatively, like PAVE, Ross could have flown in retired veterinarians from the United States each time that Archut took a test. This method might modify Ross's program less, though the risk of non-verbal clues would remain. But it would have been "outlandishly costly," and thus unreasonable. *Walton v. Mental Health Ass'n*, 168 F.3d 661, 670 (3d Cir. 1999). Archut took multiple choice tests throughout the semester. Rule 56.1 Stmt. at ¶¶ 97-98. So, to accommodate Archut, Ross would have needed to fly in a retired veterinarian several times each semester. *Id.* at ¶¶ 89, 97-99. On each occasion, Ross would have needed to compensate the veterinarian, pay for airfare, pay for meals, and reimburse hotel stays. *Id.* at ¶ 96. Ross would also

- 31 -

have needed to pay "backup" retired veterinarians to remain available on standby, in case health reasons or other emergencies caused the usual live reader to cancel on short notice. *Id.* at ¶ 100. This would likely cost between $20,000 to $25,000 a semester. *Id.* at ¶ 101.

Conversely, the tape recorded examinations were "free," because Ross did not pay its professors more for the significant time they spent recording exam questions. So, particularly given that Archut only documented an "audio accommodation," Ross saw no reason to incur the unreasonable expense of employing live readers. *See Victor*, 203 N.J. at 423-424; *see also Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 795 (1st Cir. 1992) (a university is entitled to summary judgment on reasonable accommodation claim if it comes "to a rationally justifiable conclusion" regarding what accommodations would be appropriate; it is irrelevant "whether a medical school is 'right' or 'wrong' in making program related decisions");

  iii.  *Archut Did Not Document Her Need For A Live Reader*

Archut's discrimination claims fail for yet another reason as well: she never documented needing a live reader. "For a school to be able to make reasonable accommodations for a student, it must have knowledge that such accommodations are **required**." *Shamonsky v. Saint Luke's Sch. of Nursing*, 2008 WL 724615, at *4 (E.D. Pa. 2008) (emphasis supplied); *Leacock v.*

- 32 -

*Temple Univ. Sch. of Med.*, 1998 WL 1119866, at *4 (E.D. Pa. 1998); *see also Victor*, 203 N.J. at 423 (a need for reasonable accommodation must be documented with "expert medical evidence"); *Mucci*, 2011 WL 831967 at *23 (granting summary judgment because plaintiff lacked evidence that he "required" his requested accommodation). In part, this is because the RHA and ADA only require universities to make "necessary" modifications to their academic programs. 28 C.F.R. § 35.130(b)(7); 34 C.F.R. § 104.44(a).

In this case, Archut eventually supplied documentation indicating that an "audio accommodation" would help her. Rule 56.1 Stmt. ¶ 86. But this documentation did not specify that a live reader was "required" or "necessary," or even *preferable* to tape-recorded test questions. In fact, the documentation recommended no specific "audio accommodations" at all. Thus, even if Archut "required" a live reader as a "necessary" accommodation, she never properly documented this need. *Reichert v. Elizabethtown Coll.*, 2012 WL 1205158, at *11 (E.D. Pa. 2012) (student's claim "fails because he does not present any evidence suggesting that his requested modifications were necessary"). And, Ross only needed to "provide[] accommodations based on the information [it] possesse[d]." *Forbes v. St. Thomas Univ.*, 456 Fed. Appx. 809, 812 (11th Cir. 2012) (student not entitled to private room because she "failed to provide St. Thomas any information that her alleged disability required a private room");

- 33 -

*Cattuna v. Sara Lee Corp.*, 2010 WL 3418354, at *5 (N.J. Super. A.D. 2010) (under NJLAD, an "employer cannot be faulted" if an employee "fails to supply information" to support accommodation requests).

Indeed, though it would not be sufficient, Archut *still* has not adduced evidence explaining why her impairment requires a live reader instead of a tape recorder. *See Wynne*, 976 F.2d at 795 ("an academic institution can be expected to respond only to what it knows"). At most, Archut provides only speculative assertions that a live reader would have assisted her more than a tape recording, and that this extra benefit would have been enough for her to not flunk her classes. Such unsupported speculation does not raise any genuine issues of material facts. *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1078 (8th Cir. 2006); *Wynne*, 976 F.2d at 796. More to the point, the "uncertain likelihood of success" of Archut's proposed accommodation "renders it unreasonable" as a matter of law. *Halpern*, 669 F.3d at 465.

### D.    Ross Did Not Deny Any Benefits to Archut

Archut also cannot establish the final prong of her *prima facie* case. Indisputably, she was neither denied the benefits of Ross, nor subject to discrimination because of her claimed disability. On the contrary, Ross worked actively to reasonably accommodate Archut. Rule 56.1 Stmt. at ¶¶ 115-117. And, even though Ross initially expelled Archut for legitimate, non-

discriminatory, non-prextual academic reasons, it readmitted her so that she could retake her failed classes with the provided audio accommodation. *Id.* at ¶ 115. True, Ross cautioned Archut that she might not succeed. *Id.* at ¶ 114 But Ross, as an institute of higher learning, had every right (and arguably an *obligation*) to do so. *See generally Mershon*, 442 F.3d at 1076 ("An educational institution is not required by the Rehabilitation Act or the ADA to lower its academic standards for a professional degree").

Irrefutably, it was not Ross who denied Archut the benefits of its program, but Archut herself. For, after Ross offered to readmit her, Archut declined to continue at Ross. Rule 56.1 Stmt. at ¶ 118. Having voluntarily left Ross of her own accord, Archut cannot now turn around and claim that Ross excluded her from a public accommodation on the basis of disability.

### E.    Archut Also Cannot Support An Interactive Process Claim

The NJLAD does not recognize a claim for failing to engage in the interactive process. *See Cattuna*, 2010 WL 3418354, at *6. But such a claim may exist under the ADA and RHA. To establish a *prima facie* case for such a claim, Archut must show that: (1) Ross knew her disability; (2) she requested accommodations or assistance; (3) Ross did not "make a good faith effort" to seek accommodations; and (4) she "could have been reasonably accommodated but for [Ross's] lack of good faith." *Parker v. Verizon Pa., Inc.*, 309 Fed.

Appx. 551, 560 (3d Cir. 2009).  Here, Archut requested accommodations.  But she cannot establish any other prong.

Most basically, Archut cannot meet the first and third prongs.  She cannot show that Ross knew of her disability, because she was not statutorily "disabled."  *See supra* pp. 21-25.  And she cannot show that she "could have been reasonably accommodated," because the live reader she sought was manifestly unreasonable.  *See supra* pp. 29-32; *see also Frazier v. Simmons*, 254 F.3d 1247, 1261 (10th Cir. 2001) (even if the employer failed to engage in the interactive process, summary judgment still proper "if the employee failed to show that a reasonable accommodation was possible").

As for the second prong, the evidence irrefutably establishes that Ross attempted, in good faith, to reasonably accommodate Archut.  To this end:

When Archut first requested "extra time on exams" on the Personal Data Form, Artemiou promptly asked if she wanted accommodations, and supplied instructions for seeking them.  Rule 56.1 Stmt. at ¶ 49.

When Archut then applied for two accommodations (extra time on exams and a quiet room), Artemiou approved them within a week, and gave Archut six weeks to medically document them.  *Id.* at ¶¶ 60, 61.

When Archut approached Dr. Fox about additional accommodations, he quickly responded, and met with her just a few days later.  *Id.* at ¶ 78.

When Archut requested a live reader, Artemiou told her that she'd need to document this request. *Id.* at ¶¶ 58, 80. After Archut, belatedly, supplied documentation supporting an "audio accommodation," Ross needed only three days to approve one -- the tape-recorded exams. *Id.* at ¶ 60.

When Archut then complained that the exam questions were recorded too fast, Artemiou immediately contacted Archut's professors and asked them to read the questions slower. *Id.* at ¶¶ 105-107. They all complied.

And, when Archut still flunked out, Ross readmitted her so that she could benefit from the afforded accommodations going forward. *Id.* at ¶ 115.

In the end, it was Archut who abandoned the interactive process by not returning to Ross, and instead taking her chances in court.

At most, Archut may argue that Ross somehow failed to engage in the interactive process because it demanded specific documentation supporting an audio accommodation, and did not simply supply one after receiving the initial documentation from WVU. Archut is wrong. In fact, Ross's "request for additional medical documentation reflects [its] participation in the accommodation process" *See Alotto v. ECSM Utility Corp, Inc.*, 2010 WL 5186127, at *3 n. 12 (D.N.J. 2010).

Thus, Archut's interactive process claims also fail.

### III.   Summary Judgment Is Also Proper On Archut's Contract Claim

Archut's final count alleges "breach of actual or implied contract," presumably under St. Kitts law. This claim is baseless.   Ross never contractually guaranteed Archut a live reader.

At best, Archut appears to claim that Ross's "Student Handbook" created an implied contract with her.  But, assuming St. Kitts follows English law on this issue,[8] then the Student Handbook created no contractual rights. *See Wandsworth London Borough Council v D'Silva*, [1998] IRLR 193 at p. 8 (Ct. App. Civ. Div.) (employer code of conduct merely "provid[ed] guidance" but "d[id] not set out what is contractually required to happen" because it envisioned a "flexible and informal" process) (Wexler Decl. Ex. KK).

Additionally, even if the Student Handbook can somehow be construed as a "contract," nothing in it guaranteed Archut a live reader.  The Student Handbook says only that Ross will "provide reasonable accommodations for students with documented disabilities." *Id.* at ¶ 124.

And Ross drafted and interpreted those policies with the ADA's and RHA's definitions in mind.  *Id.* at ¶ 125; *see also* ¶ 124 (empowering Ross's dean with "final authority to determine how the policies and procedures" are

---

[8] St. Kitts law system is "based on English common law."   *See* http://www.gov.kn/ct.asp?xItem=31&CtNode=63&mp=1 (last visited June 14, 2012).

"interpreted and applied). So, just as Archut had no "documented disabilities" under the ADA and RHA, and just as the live reader was not a "reasonable accommodation" under those statutes, she also had no recourse under the Student Handbook.

It should be noted that Ross did not consider itself bound by either statute. *Id.* at ¶ 126. It simply used the ADA's and RHA's definitions as a baseline, because it adopted best practices designed to help its students succeed. *Id.* at ¶ 127. For this same reason, Ross frequently extended accommodations to students who were not "disabled," but nevertheless could benefit from modest accommodations that would enable them to get the most from their educational experience. *Id.* at ¶ 128. Archut fell into that category.

## IV.    Archut Cannot Pierce The Corporate Veil Against DeVry

Archut has also sued Ross's ultimate corporate parent, DeVry, Inc. Because Archut's claims against Ross all fail, DeVry is also entitled to summary judgment. Beyond that, nothing in the record supports piercing the corporate veil or otherwise holding DeVry liable for Ross's alleged conduct. *See* Rule 56.1 Stmt. ¶ 9; *Norkunas v. Sandestin Inv., Inc.*, 2011 WL 31716, at *1 (N.D. Fla. 2011) ("as between" a parent and subsidiary, "there is but one entity that may have the required relationship" to the public accommodation to "support liability under the ADA").

<u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Defendants' Motion for

Summary Judgment in its entirety, and also grant Defendants such other relief

as the Court may deem just and proper.

Dated: New York, New York
      June 22, 2012

Respectfully submitted,
SEYFARTH SHAW LLP

By     s/Howard M.Wexler
     Howard M. Wexler
     Michael F. Marino
     Jacob Oslick
620 Eighth Avenue, 32nd Floor
New York, New York 10018-1405
Main Office Number:  (212) 218-5500
Main Fax Number:  (212) 218-5526
hwexler@seyfarth.com
mmarino@seyfarth.com
joslick@seyfarth.com
*Attorneys for the Defendants*

- 40 -