<u>**Electronically Filed**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

_____
                                  :
KATHERINE ARCHUT,                 : Civil Action No. 10-1681 (MLC)
                                  :
            Plaintiff,            :
                                  :
      vs.                         :
                                  :
ROSS UNIVERSITY SCHOOL OF         :
VETERINARY MEDICINE; DeVRY,       :
INC.; a corporation of the        :
State of Delaware, and ABC        :
Corporations 1-5, being           :
fictitiously named               :
subsidiaries of DeVry, Inc.,      :
                                  :
            Defendants.           :
_____ :

_____

BRIEF OF PLAINTIFF IN OPPOSITION TO SUMMARY JUDGMENT

_____


                          **DAVID B. RUBIN, P.C.**
                          Attorney At Law
                          44 Bridge Street
                          P. O. Box 4579
                          Metuchen, New Jersey 08840
                          (732) 767-0440
                          Attorney for Plaintiff


**DAVID B. RUBIN**
 On the Brief

## TABLE OF CONTENTS

**Page**

Table Of Citations. . . . . . . . . . . . . . . . . .ii

Statement of Facts. . . . . . . . . . . . . . . . . . 1

Standard of Review. . . . . . . . . . . . . . . . . .13

**Argument**

    I.    **The ADA, Section 504 and NJLAD Apply to Ross**. . . .13

    A.    **ADA/Section 504**. . . . . . . . . . . . . . . . . . .13

    B.    **NJLAD**. . . . . . . . . . . . . . . . . . . . . . 24

    II.    **Plaintiff Has Established a Prima Facie Case On The Merits**. . . . . . . . . . . . . . . . . . . .24

    A.    **Inconsistencies with the Discovery Record**. . . . . 25

    B.    **Factual Issues Regarding Defendants' Current Reasons**. . . . . . . . . . . . . . . . . . . . . 27

    C.    **Estoppel**. . . . . . . . . . . . . . . . . . . . .28

    D.    **"Disability" Under ADA and Section 504**. . . . . . .29

    E.    **NJLAD**. . . . . . . . . . . . . . . . . . . . . . 31

    F.    **"Not Otherwise Qualified"**. . . . . . . . . . . . 32

    G.    **Untimeliness of Documentation**. . . . . . . . . . 33

    H.    **The Interactive Process**. . . . . . . . . . . . . 35

    I.    **Common Law Contract Claim**. . . . . . . . . . . . 37

Conclusion. . . . . . . . . . . . . . . . . . . . . .38

i

**TABLE OF CITATIONS**

**Page**

**Cases**

Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 495, 446 A.
2d 486 (1982). . . . . . . . . . . . . . . . . . . . . .31

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106
S. Ct. 2505, 91 L. Ed. 2d 202 (1986). . . . . . . . . . 13

Bird v. Lewis & Clark Coll., 104 F. Supp. 2d 1271 (D. Or.
2000), aff'd, 303 F. 3d 1015 (9th Cir. 2002), cert.
denied, 538 U.S. 923. . . . . . . . . . . . . . . . .16,17

Bartlett v. N.Y. State Board of Law Examiners, No. 93 CIV
4986, 2001 WL 930792 (S.D.N.Y. 2001). . . . . . . . . . 31

Bowers v. N.C.A.A., 151 F. Supp. 2d 526, 533-34 (D.N.J.
2001). . . . . . . . . . . . . . . . . . . . . . . . . .24

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct.
2548, 91 L. Ed. 2d 265 (1986). . . . . . . . . . . . . .13

Dschaak v. Astrue, 2011 WL 4498832, slip op. at 20,
n.7 (D. Or. 2011)(emphasis added). . . . . . . . . . 30,31

Gebser v. Lago Vista Indep. Sch. Dist., 118 S. Ct. 1989,
1997 (1998)). . . . . . . . . . . . . . . . . . . . . . 17

Haskins v. First American Title Ins. Co., ____ F. Supp. 2d
____ , 2012 WL 1599998 (D.N.J. 2012). . . . . . . . . . 28

Havlik v. Johnson & Wales University, 509 F. 3d 25, 34-35
(1st Cir. 2007). . . . . . . . . . . . . . . . . . . . . 37

King v. Bd. of Control, 221 F. Supp. 2d 783 (E.D. Mich.
2002). . . . . . . . . . . . . . . . . . . . . . . . . .18

*Love v. Law Sch. Admission Council, Inc.*, 513 F. Supp. 2d
206, 226 (E.D. Pa. 2007). . . . . . . . . . . . . . . . 29

*Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869,
2877-78 (2010). . . . . . . . . . . . . . . . . 13,14,23

*Ross v. Creighton Univ.*, 957 F. 2d 410, 416 (7th Cir. 1992). .37

*Rothberg v. Law School Admission Council, Inc.*, 300 F. Supp.
2d 1093, 1104 (D. Colo. 2004), *rev'd on other grounds*,
102 Fed. Appx. 122 (10th Cir. 2004). . . . . . . . . . 31

*U.S. v. Weingarten*, 632 F. 3d 60, 65 (2nd Cir. 2011). . . . . 14

*Vurimindi v. Fuqua School of Business*, 435 Fed. Apx. 129,
133 (3rd Cir. 2011). . . . . . . . . . . . . . . . . 37

### Other Authorities Cited

45 C.F.R. § 84.3. . . . . . . . . . . . . . . . . . . .29

20 U.S.C. § 1232g.  *Id.* at pp. 9-11. . . . . . . . . . . 21

29 U.S.C. § 794(a). . . . . . . . . . . . . . . . . . .14

29 U.S.C. § 794(b),(b)(3)(A). . . . . . . . . . . . . . .15

Fed. R. Civ. P. 56(a). . . . . . . . . . . . . . . . . 13

Arlene S. Kanter, *The Presumption Against Extraterritoriality*
*As Applied to Disability Discrimination Laws: Where*
*Does It Leave Students With Disabilities Studying Abroad?*,
14 Stanford Law & Policy Review 291 (2003). . . . . .18,19

Re: Ariz. State Univ., Case No. 08012047 (2001), Wexler
Dec., Ex. II. . . . . . . . . . . . . . . . . . . .19,20

College of St. Scholastica (OCR Region V 1992), Rubin Dec.,
Ex. J. . . . . . . . . . . . . . . . . . . . . . .20

iii

<u>Husson College</u> (OCR, Eastern Division 2005), Rubin Dec.,
     Ex. I. . . . . . . . . . . . . . . . . . . . . . . .20

<u>St. Louis University</u> (OCR Region VII 1990), Rubin Dec.,
     Ex. K. . . . . . . . . . . . . . . . . . . . . . . .20

**<u>Statement of Facts</u>**

   Plaintiff, Katherine Archut ("Katie"), applied to Ross University School of Veterinary Medicine in the spring of 2007, and was interviewed at Ross's Edison, New Jersey headquarters in August 2007.[1]  Deposition of Katherine Archut, Wexler Dec., Ex. B, T:65-3 to T:68-15.  During the interview, when discussing her academic background, she disclosed to the interviewer that she had a learning disability, for which she received accommodations at West Virginia University (WVU) including "extra time," "a separate room," "separate notes and a calculator," and "I had had exams read to me in the past."  <u>Id.</u>, T:69-9 to T:72-17.

   At all relevant times, Ross maintained an official "Policy on Non-Discrimination," providing as follows:

>       The University does not discriminate on the
>       basis of race, color, national origin,
>       gender, religion, disability, or age in
>       admission to, access to, treatment in, or
>       employment in its programs and activities.
>       It is the policy and practice of the
>       University to comply with the Americans with
>       Disabilities Act as applicable and practical
>       in St. Kitts. No qualified individual with a
>       disability will be denied access to or
>       participation in services, programs, or
>       activities of Ross University.

http://www.rossu.edu/veterinary-school/admissions/getstarted.cfm, accessed on August 17, 2012.

---

[1]  Ross has since moved its headquarters to North Brunswick, New Jersey.

Ross also had in effect a 2008 Student Handbook, Wexler

Dec., Ex. GG, addressing matters relevant to this case,[2]

including section 1.6, "Disability Services," which provided as

follows:

> University provides reasonable accommodation
> for students with documented disabilities so
> long as they are otherwise qualified to
> participate in the academic program and
> University activities.  Accommodations are
> provided only after they are requested by
> the student and approved by the University.
> All students must meet the Professional
> Standards, whether with accommodations or
> not.  The University counselor is available
> to advise on this issue and provide forms
> for requesting disability services.

While the Americans with Disabilities Act ("ADA") or

Section 504 of the Rehabilitation Act of 1973 ("Section 504")

were not explicitly mentioned in this passage of the Handbook,

Ross's policy and practice was to apply their standards and

procedures in addressing the needs of disabled students

requiring accommodations.  Deposition of Dr. Sean Fox, Wexler

Dec., Ex. D, T:12-7 to T:14-15; T:24-17 to T:26-14; T:30-8 to

17, T:28-3 to T:29-6.  Deposition of Elpida Artemiou, Wexler

Dec., Ex. C, T:29-5 to T;31-19; T:32-11 to T:33-17.

---

[2]  Although the cover of the 2008 version of the Student
Handbook states that it is "effective January 1, 2008," the
Handbook itself provides that its terms were effective as of
September 1, 2007."  Wexler Dec., Ex. GG, p. 4.

This policy, implicit in the 2008 version of the Student Handbook, is reflected explicitly in the 2012 version at section 1.7:

> The Americans with Disabilities Act (ADA) gives individuals with disabilities civil rights protection that is similar to that provided to all individuals on the basis of race, sex, national origin, and religion. The act guarantees equal opportunity in employment, public accommodations, transportation, state and local government services, and telecommunications.  In addition, Section 504 of the Rehabilitation act states: "No otherwise qualified handicapped individual in the United States shall, solely on the basis of his/her handicap, be denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."
>
> The policy of RUSVM is consistent with the ADA and Section 504. . . .

Rubin Dec., Ex. F.

Katie was admitted to Ross, and arranged for Rebecca Berger, a counselor with WVU's Office of Disability Services, to furnish Ross with information about Katie's disability and the accommodations that she had received at WVU.  On December 11, 2007, a month before Katie arrived in St. Kitts to begin classes, Berger faxed a letter to William Bingham, an employee in Ross's admissions office at its Edison, New Jersey, administrative headquarters, confirming that Katie had received

3

disability accommodations at WVU, and recommending that they be made available to her at Ross.  Wexler Dec., Ex. G.

Berger's letter identified numerous accommodations that Katie had received at WVU but, as Berger later would acknowledge, she inadvertently neglected to mention that Katie also had received a live reader for certain exams.  However, Katie was not copied on Berger's letter, and was unaware of what Berger had reported to Ross.  Deposition of Katherine Archut, Wexler Dec., Ex. B, T:86-13 to T:88-23.

Shortly after arriving in St. Kitts, Katie completed a "Disability Services Request" form on January 10, 2008.[3]  Wexler Dec., Ex. J.  The first page of the form asked her to "state all of the disabilities for which you are requesting an accommodation[,]" to which Katie replied, "Dyslexia/Learning Disability."  She was then given two lines to "provide a brief description of your diagnosis or disability," to which she replied:

> Undetermined learning disability (see test
> results) most likely dyslexia, runs heavily
> on my mother's side of the family.  Examiner
> had told me I showed tendencies of dyslexia
> throughout testing.  I had a severe head
> trauma when I was younger that could be a
> result to my learning disability today.

---

[3]  From this point forward, unless otherwise indicated, all dates are in 2008.

4

The form then asked Katie to "choose the accommodations you are requesting," but offered only two options to choose from – "Additional time on examination (1.5)" and "Exam room with minimal distractions" – and no space to add other proposed accommodations.  In a handwritten addendum to the form, Katie wrote, in pertinent part:

> I did have some test [sic] orally.  That helped me tremendously to have it read to me as well as having to read it.  Not always required but if I can't understand the phrasing I am able to break it down if I can hear it. . .

During the first week of classes in January, after submitting her Disability Services Request form, Katie met with Elpida Artemiou, the school counselor, to discuss her accommodations further.  Artemiou had been the school counselor since 2004.  Deposition of Elpida Artemiou, Wexler Dec., Ex. C, T:12-17 to T:13-3.  She had no prior experience or training as a school counselor, or with regard to accommodation of student disabilities, id., T:20-19 to T:21-10, but was given an orientation to her duties by Dr. Jane Sandquist, her immediate predecessor, who had been promoted to Assistant Dean for Academic Administration.  Id., T:21-11 to 20.

Sandquist, whose only background in the disabilities field was as a K-12 school psychologist, Deposition of Dr. Jane Sandquist, Rubin Dec., Ex. B, T:21-5 to 20, instructed Artemiou

that Ross provided two, and only two, accommodations for disabled students:  time and a half for exams, and a room with minimal disruptions. Id., T:23-14 to T:25-18.  She further instructed Artemiou that Ross was only obligated to offer accommodations that "fit with [its] program," id., T:19-10 to 23, and was not obligated to tailor accommodations to the needs of any particular student. Id., T:25-11 to T:26-15.

In Katie's initial meeting with Artemiou in early January, she explained the accommodations that she had received at WVU, and explicitly mentioned having multiple choice exams read to her.  Artemiou told Katie that no one had ever asked for that accommodation before, but that she would "look into it." Deposition of Katherine Archut, Wexler Dec., Ex. B, T:81-3 to T:82-20.  Artemiou told Katie that as soon as she received Katie's disability documentation, she would get back to Katie with a decision on what accommodations would be afforded.  Id., T:83-3 to T:84-23.

On January 14th, Artemiou advised Katie by e-mail that she had "not been able to get your documentation from NJ[,]" and asking if it would be possible for WVU to fax the information directly to Artemiou.  Wexler Dec., Ex. K.  That day or the following day, Katie's father, Dan Wright, received a telephone call at his home in Virginia from Bingham at Ross's New Jersey headquarters, advising that he had misplaced Katie's disability

documentation from WVU, and asking whom to contact to get another copy.[4]   Katie's father gave him Berger's name, and offered to locate her telephone number, but Bingham said that he would locate her number himself and contact her.   Declaration of Dan Wright.

On January 16th, Artemiou sent Katie an e-mail advising that Katie had been approved for certain accommodations on a provisional basis, but still requesting a copy of Katie's back-up documentation to support her disability.   Wexler Dec., Ex. L. Katie was concerned that the live reader was not among the accommodations yet being offered, and met with Artemiou again to express her concern.   Deposition of Katherine Archut, Wexler Dec., Ex. B, T:90-23 to T:92-1.

Katie wrote back on January 18th, indicating her understanding that WVU had sent her back-up documentation to Bingham a month earlier, but Artemiou replied that, so far as she was aware, all that Ross could find was Berger's one-page letter of December 11, 2007.   Wexler Dec., Ex. M.   On February 14th, after learning from Artemiou that Ross was, once again, unable to locate her disability back-up documentation, Katie telephoned Berger at WVU to request, once again, that her

---

[4]   Bingham testified, in deposition, that he did not recall this, but could not deny it.   Deposition of William Bingham, Rubin Dec., Ex. D, T:10-6 to T:11-16.

documentation be faxed to Ross.  Wexler Dec., Ex. N; Plaintiff's Answers to Interrogatories, Rubin Dec., Ex. A, p. 8.

On February 27th, Katie wrote to Artemiou desperately imploring her to provide the reader accommodation, as she was on the verge of failing her courses.  Wexler Dec., Ex. P.  Artemiou again responded that she was looking into it.   Wexler Dec., Ex. BB; Deposition of Katherine Archut, Wexler Dec., Ex. B, T:111-22 to T:113-4.

On February 27th, Katie also e-mailed Dr. Sean Fox, Associate Dean for Student Life and Artemiou's immediate supervisor, urgently requesting his assistance.  Wexler Dec., Ex. Q.  The following day, Katie's father also e-mailed Dr. Fox a lengthy letter detailing his daughter's plight and, as a concerned father, also requesting his intervention.  Wexler Dec., Ex. R.  Fox responded to Katie's e-mail, and a meeting was scheduled at his office for early March.  Wexler Dec., Ex. Q.

In Katie's meeting with Fox, he strongly encouraged her to withdraw from the program.  He told her that just because she had a dream to become a veterinarian did not mean that she would get to be one.  He also stated that Ross would not provide Katie with a reader accommodation because it was perceived as being a "crutch," and if she could not succeed without the accommodation she should not be in the profession, regardless of her

8

disability.  Plaintiff's Answers to Interrogatories, Rubin Dec.,
Ex. A, pp. 9-10.

Fox admits telling Katie that Ross would not grant her a
live reader accommodation because it was not available on the
PAVE or ECFVG national licensing examinations, and Ross did not
want to provide an accommodation that she would not have "at the
other end," and fail.  Deposition of Sean Fox, Wexler Dec., Ex.
D, T:74-12 to T:75-10; T:90-6 to T:94-7.  (As we will explain
later, Fox's understanding was incorrect.)

Following her meeting with Fox, Katie requested a meeting
with Dr. Guy St. Jean, Associate Dean for Academic Affairs,
which took place on March 11th.  Prior to the meeting, Katie's
father, through his own research, had discovered that Dr. Julie
Baumberger, a nationally known expert on assisting students with
disabilities, had become a staff member at Ross University
School of Medicine on the nearby island of Dominica.  See
http://www.rossu.edu/medical-school/news/3821/12/no, accessed on
August 17, 2012.  He e-mailed her on March 10th, and subsequently
spoke with her by telephone concerning Katie's difficulties, but
she told him that she could be of no assistance in the matter.
Plaintiff's Answers to Interrogatories, Rubin Dec., Ex. A, p. 3.

At the March 11th meeting with St. Jean, Katie explained to
her dire situation, and why having live reader for multiple
choice examinations was so important for her success.   She also

9

proposed, as an alternative, that her professors be allowed to reformat her multiple choice exams.   The Student Handbook permitted professors to do so, and asking the same questions in an essay or short answer format instead of multiple choice would make a positive difference for her.   Plaintiff's Answers to Interrogatories, Rubin Dec., Ex. A, pp. 10-11.

Katie had spoken with several professors about changing the format of her exams in this fashion, including her microanatomy professor, Dr. Stimmelmyer, who told her that she would be happy to read the exam or change to a short answer format if that was easier for her.   Stimmelmayer later told Archut that she was not allowed to do so, even though the Student Handbook at the time permitted it.   Id.

Katie told St. Jean that the AVMA provides live reader accommodation to students who sit for their boards exams.   St. Jean was surprised by that information, but confirmed it in a telephone call to the AVMA during the meeting.   Id.

Artemiou joined the meeting at that point.   She had Katie's psycho-educational report with her, and said that there was nothing in it explicitly stating that Katie required a reader accommodation.   While we concede that those words were not explicitly mentioned in the report itself, it is undisputed that neither Artemiou nor St. Jean was competent to interpret the report, or to discern what accommodations the report reasonably

10

contemplated.  Plaintiff's Answers to Interrogatories, Rubin Dec., Ex. A, p. 6.[5]

This was the first that Katie had been told that the information provided by WVU did not explicitly mention a live reader accommodation.  As soon as the meeting was over, she called Berger at WVU to request explicit written confirmation of the reader accommodation that she required. Berger said she would respond immediately.  Id.  On March 25th, Berger faxed to Artemiou a follow-up letter confirming that she had inadvertently omitted mention of a live reader from her earlier letter, and that Katie needed this accommodation.  Wexler Dec., Ex. U.

On March 28th, Artemiou sent Katie an e-mail advising that she would be given an audiorecording of her test questions, but not the live reader that she had requested.  Wexler Dec., Ex. V. At that point, the semester was virtually over.  The only tests that remained were one anatomy lab final, for which this accommodation was unnecessary, and Katie's final examinations. Plaintiff's Answers to Interrogatories, Rubin Dec., Ex. A, p. 9.

---

[5]   Fox testified in depositions that Dr. Sandquist would have been the only administrator at Ross competent to review and understand such a report; however, she was never consulted about it.  Deposition of Sean Fox, Wexler Dec., Ex. D, T:124-9 to T:125-3; Deposition of Jane Sandquist, Rubin Dec., Ex. B, T:35-20 to T:37-14, T:38-6 to 13.

The audiorecordings were not adequate to assist Katie with her final exams.  The sound quality was poor, which made it all the more difficult to understand the professors, who had foreign accents.  Deposition of Katherine Archut, Wexler Dec., Ex. B, T:154-23 to T:155-21.  After sending Artemiou an e-mail requesting that the professors speak more slowly, Wexler Dec., Ex. W, the later recordings were "unbelievably slow," and also not helpful.  Deposition of Katherine Archut, Wexler Dec., Ex. B, T:155-22 to T:156-11.

On April 19th, St. Jean advised Katie by letter that she had failed three out of five courses, and was being dismissed from Ross.  Wexler Dec., Ex. AA.  Katie filed an appeal, as provided for in the Student Handbook, explaining why the lack of a live reader or, alternatively, a change in the format of her exams, was the difference between her passing and failing.  Wexler Dec., Ex. BB.

On May 7th, St. Jean wrote to Katie again, advising that her appeal had been granted, and that she would be allowed to return to Ross, but still without the live reader accommodation that she required.  Wexler Dec., Ex. DD.   Instead, St. Jean wrote, her "examinations would be recorded by different individuals. These individuals may have different accent and voice inflection.  The format of the examinations will be the same as other students in your course."  Id.  Because of Ross's

12

unwillingness to provide the live reader accommodation or flexibility regarding the format of her exams, Katie determined not to return to Ross.

### Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)  The Court will thus grant a motion for summary judgment when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party", and a fact is "material" if it might affect the outcome of the suit under the applicable rule of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

### Argument

**I.    The ADA, Section 504 and NJLAD Apply to Ross.**

**A.    ADA/Section  504**

Defendants argue that the presumption against extraterritorial application of United States laws, see,

13

Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869,
2877-78 (2010), frees them from any obligation to comply
with federal or New Jersey anti-discrimination statutes.
We disagree.

The case law applying this presumption makes clear
that it is overcome by evidence of Congressional intent to
apply a statute extraterritorially, and that this evidence
may be found not only in the text of the legislation but,
also, from legislative history and overall context.
Morrison, 130 S. Ct. at 2883; U.S. v. Weingarten, 632 F. 3d
60, 65 (2nd Cir. 2011).  All available evidence should be
considered, id., and it is abundant with respect to anti-
discrimination statutes governing colleges and universities
that receive federal funds.

Section 504 prohibits "any program or activity receiving
Federal financial assistance" from discriminating against an
"otherwise qualified individual with a disability ... solely by
reason of her or his disability."  29 U.S.C. § 794(a).   The
term "program or activity," was expanded by the Civil Rights
Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28
(1988), to include "all of the operations of ... an entire
corporation, partnership, or other private organization" if
either (1) federal financial "assistance is extended to such
corporation, partnership, private organization, or sole

14

proprietorship as a whole," or (2) the organization "is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation," and any part of the organization receives federal financial assistance.  29 U.S.C. § 794(b),(b)(3)(A).

Ross is a substantial beneficiary of U.S. government-backed student financial aid.  According to DeVry's 2008 Annual Statement, Rubin Dec., Ex. E, Ross students participated in a wide variety of U.S. Department of Education financial aid programs under Title IV of the Higher Education Act.  Id., pp. 22-23.  As a condition of eligibility, Ross had executed a "program participation agreement" with the Department of Education in 2004, with an expiration date of June 30, 2008, requiring it to adhere to all applicable statutes and regulations governing recipients of federal funds.  Rubin Dec., Exhibit J.

While Ross attempts to portray itself in this case as a foreign graduate school with no meaningful ties to the United States, other than some nominal administrative support from an office in New Jersey, the evidence proves that it is integrally incorporated into the business operations of its parent company, DeVry, Inc.  In 2003, DeVry assumed control of Ross, which is now referred to in DeVry's annual reports and government filings

15

as a division of DeVry.  DeVry's 2004 Annual Report, filed just after DeVry acquired Ross, detailed the close interrelationship of Ross to DeVry's business operations.  Rubin Dec., Ex. H (Ex. A), at pp. 4-5.  DeVry's 2008 Annual Report stated that it "owns and operates" Ross through its "wholly-owned subsidiaries." Rubin Dec., Ex. E, p. 3, and incorporates Ross's income into its own consolidated financial statements.  Ross's President was listed on the Ross website as both President of Ross and Executive Vice President of DeVry.  These facts further signify that the two entities are, for all purposes relevant to this case, one in the same.

Neither Section 504, Title III of the ADA nor the NJLAD explicitly address their applicability to American students studying abroad in programs run or supervised by American-based colleges and universities, and very few cases have focused on the presumption against extraterritorial application of state and federal law in that setting.  So far as we can tell, the issue was addressed in the federal courts for the first time in an unpublished summary judgment decision in Bird v. Lewis & Clark Coll., 104 F. Supp. 2d 1271 (D. Or. 2000), aff'd, 303 F. 3d 1015 (9th Cir. 2002), cert. denied, 538 U.S. 923.

Bird was a wheelchair-bound student at Lewis & Clark College who participated in an overseas program in Australia run by the institution.  He attended the program, but claimed that

16

he was denied reasonable accommodation for his disability.  In denying summary judgment to the College early in the case, Rubin Dec., Ex. M, the court analyzed and rejected the College's argument that federal disability discrimination laws could not be applied to programs outside the territorial boundaries of the United States.

The court found, among other things, that the receipt of federal student loan funds obligated the College to adhere to Section 504 and the ADA because, unlike other anti-discrimination statues such as Title VII, Section 504 was enacted pursuant to the Spending Clause.  As with Title VI and Title IX, the acceptance of federal funds constitutes a promise that the recipient will not discriminate in what is "essentially a contract."  Bird, supra, at p.8 (quoting Gebser v. Lago Vista Indep. Sch. Dist., 118 S. Ct. 1989, 1997 (1998)).  As the court observed, if defendants' argument were accepted, students in overseas programs "would become the proverbial 'floating sanctuaries from authority,' not unlike stateless vessels on the high seas."  Id. at p. 9.

Ultimately, Bird's Section 504 and ADA claims were rejected on their merits, but he did prevail on a common law breach of fiduciary duty claim which was affirmed by the Ninth Circuit. All of these rulings were premised on the district court's original ruling that Section 504 and the ADA applied to the

17

overseas program, a ruling that was never questioned in any of
the courts' subsequent opinions.

Similarly, in King v. Bd. of Control, 221 F. Supp. 2d 783
(E.D. Mich. 2002), a Michigan court held that Title IX could be
applied extraterritorially to a sexual harassment claim by
female students at Eastern Michigan University, based on conduct
occurring during a five-week study abroad program in South
Africa.

As one commentator has observed, the legislative histories
of Section 504 and the ADA support coverage for students in
overseas programs.  See Arlene S. Kanter, *The Presumption
Against Extraterritoriality As Applied to Disability
Discrimination Laws: Where Does It Leave Students With
Disabilities Studying Abroad?,* 14 Stanford Law & Policy Review
291 (2003)("Kanter").  There phrase "in the United States" did
not receive much discussion in the legislative history, but the
phrase "program or activity" got considerable attention.  As
Professor Kanter notes, the House Report on Title VI indicated
that the statute is very broad, describing the law as
"prevent[ing] discrimination in federal financial assisted
programs" and "guarantee[ing] that there will be no
discrimination among recipients of Federal financial
assistance."  Id.

18

Professor Kanter also observed that when Congress enacted the 1991 Civil Rights Act Amendments, it criticized the Supreme Court for adopting an unduly restrictive interpretation of civil rights laws.  According to Congress at that time, the Court failed to apply the canon that "[a]ll Federal laws protecting the civil rights of persons shall be interpreted consistent with the intent of such laws, and shall be broadly construed to effectuate the purpose of such laws to provide equal opportunity and provide effective remedies."  In particular, the House Report on the legislation noted that such failure "interferes with the ability of Congress to express its will through legislation."  The House report further stated that "[d]uring the past decade the Court has deviated repeatedly from this principle and given unduly narrow constructions to civil rights statutes.  As a result, Congress has been required to pass legislation to override these interpretations."  Further, when it enacted the ADA, Congress made clear that the ADA is not to be interpreted to provide less protection than section 504. Kanter at 313-14.

Ross relies on an opinion from one regional office of the U.S. Department of Education Office for Civil Rights ("OCR"), Re: Ariz. State Univ., Case No. 08012047 (2001), Wexler Dec., Ex. II, for the proposition that Section 504 and the ADA do not apply to discrimination against students outside the territorial

19

boundaries of the United States.  As we will show, that opinion from one of OCR's numerous regional offices is distinguishable on its facts, and cannot be squared with other OCR opinions, issued before and afterward.

In Arizona State, the university denied a deaf student a sign language interpreter while he studied abroad at the University of Cork in Ireland, and that particular OCR regional office concluded that Section 504 and ADA protections do not extend extraterritorially.  So far as it appears from the decision, the overseas program was run entirely independent of Arizona State, unlike Ross which itself is a recipient of federal funds.

In three other matters, however, OCR regional offices took a different tack.  In Husson College (OCR, Eastern Division 2005), Rubin Dec., Ex. I, College of St. Scholastica (OCR Region V 1992), Rubin Dec., Ex. J, and St. Louis University (OCR Region VII 1990), Rubin Dec., Ex. K, OCR reached the merits of students' failure-to-accommodate claims arising from overseas programs in Honduras, Ireland and Spain, without raising any concern about extraterritorial applicability of Section 504 or ADA.  All that can be said of the disparate positions of OCR's regional offices on extraterritoriality is that they are a welter of confusion, and of no assistance to the Court on this motion.

20

Ross's contention that it is not governed by federal law is
further belied by its own Student Handbook, which makes
abundantly clear that students at its St. Kitts campus are
protected by numerous U.S. laws.  The version of the Student
Handbook in effect when Katie attended in 2008 refers to "U.S.
Department of Education requirements" with which Ross must
comply, Wexler Dec., Ex. GG, p. 5, and cites, among other legal
authorities, "Laws of the United States" and "federal, state and
local laws of the United States" that may apply to behavior such
as the misuse of alcohol and illegal drugs.  Id., pp. 37-38.
Section 1.8 advises students of their rights regarding their
records under the Family Educational Rights and Privacy Act. 20
U.S.C. § 1232g.  Id. at pp. 9-11.

Accommodations for students with disabilities was addressed
at Section 1.6, "Disability Services," which provided:

> University provides reasonable accommodation
> for students with documented disabilities so
> long as they are otherwise qualified to
> participate in the academic program and
> University activities.  Accommodations are
> provided only after they are requested by
> the student and approved by the University.
> All students must meet the Professional
> Standards, whether with accommodations or
> not.  The University counselor is available
> to advise on this issue and provide forms
> for requesting disability services.

While neither the ADA or Section 504 were explicitly
mentioned, Fox and Artemiou confirmed in their depositions

that Ross intended to adhere to their requirements.

Deposition of Dr. Sean Fox, Wexler Dec., Ex. D, T:24-17 to

T:26-14, T:12-7 to T:14-15, T:30-8 to 17, T:28-3 to T:29-6.

Deposition of Elpida Artemiou, Wexler Dec., Ex. C, T:29-5

to T;31-19; T:32-11 to T:33-17.

This policy is reflected even more clearly in the 2012

version of Ross's Student Handbook, which provides:

> The Americans with Disabilities Act (ADA)
> gives individuals with disabilities civil
> rights protection that is similar to that
> provided to all individuals on the basis of
> race, sex, national origin, and religion.
> The act guarantees equal opportunity in
> employment, public accommodations,
> transportation, state and local government
> services, and telecommunications.  In
> addition, Section 504 of the 1973
> Rehabilitation act states: "No otherwise
> qualified handicapped individual in the
> United States shall, solely on the basis of
> his/her handicap, be denied benefits of, or
> be subjected to discrimination under any
> program or activity receiving federal
> financial assistance."
>
> The policy at RUSVM is consistent with the
> ADA and Section 504. . . . .

Rubin Dec., Ex. F, p. 11.

Defendants attempt to distinguish Judge Lifland's 2006

decision in Dean-Hines v. Ross University School of Veterinary

Medicine, et als, Civ. No. 05-3486, Rubin Dec., Ex. G, another

student disability accommodation ADA/Section 504/NJLAD case

22

against Ross in which the undersigned also represented the plaintiff.[6]   For the following reasons, defendants' arguments have no merit.  The Supreme Court's decision in <u>Morrison</u> does not change the legal landscape from 2006 in any respect relevant to the present case.  The presumption against extraterritorial application of U.S. laws existed in 2006.  <u>Morrison</u> merely applied that longstanding doctrine to overrule a line of lower court cases applying a more lenient standard to claims arising under § 10(b) of the Securities Exchange Act of 1934.

Defendants further argue that <u>Dean-Hines</u> involved conduct in New Jersey, whereas the present does not.  Again, we disagree.  But for the misplacement of Katie's disability documentation from WVU by Ross's New Jersey headquarters in December 2007, the discrepancy between that documentation and Katie's clearly explained need for a live reader would have been detected in her initial meeting with Artemiou during the first week of class in early January 2008.  Once detected, Berger's inadvertent omission of a reference to live reader accommodation in her December 2007 letter could have been promptly corrected,

---

[6]   Defendants' mere mention of this case draws their credibility into question, as these same defendants denied, in answers to interrogatories, that any student disability accommodation claims ever had been brought against them from 1990 to the present.  Defendants' Objections and Responses to Plaintiff's First Set of Interrogatories, Rubin Dec., Ex. L, p. 13.  Plainly, this was not a truthful response.

in time to get Katie the help she so desperately needed. Instead, Katie languished for months.

For these reasons, we submit that application of Section 504 and Title III of the ADA is not barred by the presumption against extraterritorial application.

**B. NJLAD**

As for application of the NJLAD, our courts have applied a "contacts" analysis, similar to that used to determine personal jurisdiction, to assess whether a particular set of facts will justify coverage under the statute.  See Bowers v. N.C.A.A., 151 F. Supp. 2d 526, 533-34 (D.N.J. 2001), where the specific harm arguably occurred in Iowa, but the Iowa defendant had engaged in contacts with New Jersey that rendered application of the NJLAD neither arbitrary nor fundamentally unfair – most notably, its recruitment activities here, intended to entice a New Jersey resident to play football in Iowa.  Certainly the aggregation of Ross's contacts with New Jersey is sufficient to render application of the NJLAD to these defendants "neither arbitrary nor fundamentally unfair."  151 F. Supp. 2d at 536.

**II. Plaintiff Has Established A Prima Facie Case On the Merits**

Defendants argue that Katie's claims must fail on the merits, because she does not have a statutorily-eligible "disability", she was not "otherwise qualified," the live reader

24

was an unreasonable accommodation, the audiorecordings were a reasonable accommodation, and Katie herself abandoned a fully-compliant "interactive process."  For the following reasons, these arguments must be rejected.

## A. <u>Inconsistencies with the Discovery Record</u>

In evaluating the credibility of a party's position, the court should consider any inconsistency with positions taken earlier in the litigation.  The positions now taken on this motion for why Ross denied Katie the requested accommodations are entirely inconsistent with what they represented were the reasons in discovery.  For example, defendants were asked, in interrogatories, to "[s]et forth in as much detail as you are able the reasons why 'live reader' accommodation was not provided to plaintiff."  Interrogatory No. 6, Rubin Dec., Ex. L. If the reasons defendants now advance on their motion were the true reasons, they would – or, at least, should -- have been disclosed in response to this plainly worded discovery request. Instead, defendants responded as follows:

> See General Objections 2, 6, 7 and 12.
> Defendants further object to this
> Interrogatory to the extent it assumes
> Defendants had any legal obligation to grant
> the "live reader" accommodation to Archut.
> Subject to and without waiving the foregoing
> objection, Defendants state that it granted
> the accommodation of having Archut's
> professors tape record her examinations for
> her, allowing her to play and re-play the
> tape as many times as she wanted or needed

> while taking her examinations.  Defendants
> further respond to this Interrogatory by
> referring Plaintiff to the documents
> produced in response to Plaintiff's Initial
> Request for the Production of Documents,
> including e-mail correspondence between
> Archut and Elpida Artemiou, correspondence
> between Dr. Guy St. Jean and Archut,
> Archut's application to enroll at Ross,
> Archut's disability services request form,
> correspondence between Archut and Dr. Sean
> Fox, correspondence between Archut and Dr.
> Guy St. Jean, correspondence between Rebecca
> Berger of West Virginia University and Bill
> Bingham of Ross, and correspondence between
> Dr. Raphaela Stimmelmayr and Archut.

Nowhere in this boilerplate response is there any reference to the concerns expressed for the first time in St. Jean's declaration, nor are those concerned cited in any of the "documents produced in response to Plaintiff's Initial Request for the Production of Documents" that were incorporated by reference in their answer.  Declaration of Katherine Archut. Either they should be rejected out of hand and summary judgment denied or, at a minimum, discovery should be reopened to permit plaintiff a fair opportunity to meet them.

Another inconsistency is that Fox, in his deposition, also testified that, at his March meeting with Katie, he informed her that the real reason why she had not been given a live reader accommodation was because it was not available on the national licensing examinations, and Ross did not want to provide an accommodation that will not be available "at the other end," and

have her fail.  Deposition of Sean Fox, Wexler Dec., Ex. D,
T:90-6 to T:92-10; T:93-13 to T:94-7.  Fox also testified that
St. Jean later told him that, in fact, live reader accommodation
was allowed on those exams, id. T:98-20 to T:99-16, and
acknowledged that the reason he gave Katie at the meeting for
the denial of her requested accommodation was, as it turned out,
unfounded.  Id. T:100-20 to T:101-16.

There also is conflicting evidence in the record about who
actually made the decisions concerning Katie's accommodations.
Artemiou claimed in her deposition that she could not have made
the decision herself, but required the approval of either Fox or
Sandquist, both of whom, in their depositions, disavowed any
involvement.  Deposition of Sean Fox, Wexler Dec., Ex. D., T:35-
10 to 13, T:64-8 to T:67-33, T:110-6 to T:111-11; Deposition of
Elpida Artemiou, Wexler Dec., Ex. C, T:44-5 to T:44-20;
Deposition of Jane Sandquist, Rubin Dec., Ex. B, T:31-3 to T:32-
3; T:27-14 to T:28-5.

**B.   Factual Issues Regarding Defendants' Current Reasons**

One of Ross's now-professed reasons why a professor could
not be made available is because they need to remain with their
classes during examinations to answer students' questions.  The
credibility of this contention is belied by Ross's own
Examination Policy, which provided that

> No questions are allowed during
> examinations, except in those cases where
> identification of a structure (e.g., by pin
> placement at a station in an Anatomy Lab
> Exam, pointer placement on a projected image
> or microscope slide in Histology, Pathology,
> etc.) requires clarification.

Wexler Dec., Ex. GG, p. 13 at Section 2.5.6.

The Examination Policy also permits examinations to be administered to individual students in a separate location when necessary.  Id., Section 2.5.3.  If a professor could be spared to administer an examination to a student individually for compelling reasons, there is no reason apparent from the record why the same dispensation could not have been afforded to Katie.

## C.  Estoppel

In addition to these numerous inconsistencies, which are sufficient in themselves to call into question the bona fides of Ross's present explanation, Ross should be estopped at this point to deny that Katie was "disabled" under the relevant statutes.  Estoppel is appropriate to prevent a litigant from repudiating a position or course of action that reasonably had been relied upon by an adverse party.  Haskins v. First American Title Ins. Co., ____ F. Supp. 2d ____ , 2012 WL 1599998 (D.N.J. 2012).  Defendants never denied that Katie was "disabled" in their answer to the complaint,[7] and, more importantly, throughout

---

[7]  In response to plaintiff's allegation that "[a]t all relevant times, Plaintiff suffered from a learning disability

Katie's matriculation Ross in fact treated her as "disabled" under policies that Ross's officials have testified were intended to incorporate the same standards as the ADA.

Nothing in Ross's discovery responses raised any question that Katie was "disabled."  The recent substitution of new attorneys on the scene for defendants notwithstanding, the dispute in this case has, from the start, been limited to whether the accommodations provided to Katie were appropriate, and defendants should be estopped to deny at this point that Katie was "disabled."

### D. **"Disability" Under ADA and Section 504**

Should the Court be inclined to reach the merits of whether Katie was "disabled," defendants correctly assert that not all learning disorders necessarily qualify as a "disabilities" under the relevant statutory standards, as they may be so <u>de</u> <u>minimis</u> that they have no significant effect on one's ability to engaging in "major life activities" such as "learning," 45 <u>C.F.R.</u> § 84.3, or "reading." <u>Love v. Law Sch. Admission Council, Inc.</u>, 513 <u>F. Supp.</u> 2d 206, 226 (E.D. Pa. 2007).  But this surely is not such a case or, at least, a reasonable jury could so find.

---

constituting a handicap within the scope of § 504[,]" Complaint, Wexler Dec., Ex. A, ¶ 48, defendants replied in their answer: "To the extent that the allegations in paragraph 48 of the Complaint call for legal conclusions, no response is required." Answer of of Defendants, ¶ 48.

*Ross itself* accepted, and provided at least some disability accommodations based upon, a detailed psycho-educational report diagnosing Katie with Axis I 315.9 Learning Disorder NOS (Not Otherwise Specified).[8]  Wexler Dec., Ex. N.  The report found significant deficits in Katie's ability to process information, great difficulty with visual memory, poor visual motor coordination, low reading fluency, poor academic fluency, and substantial difficulty processing symbolic language.  There was a stark discrepancy between her academic performance as measured

---

[8]  "Per the [Diagnostic and Statistical Manual of Mental Disorders (4th ed.2000)] (hereinafter DSM-IV), 'Learning Disorders' are 'characterized by academic functioning that is substantially below that expected given the person's chronological age, measured intelligence, and age-appropriate education.' DSM-IV at 39.  Further, '[t]here may be underlying abnormalities in cognitive processing (e.g., deficits in visual perception, linguistic processes, attention, or memory, or a combination of these) that often precede or are associated with Learning Disorders.' Id. at 50. Regarding 'Learning Disorder Not Otherwise Specified' [7] (315.9), the DSM-IV states that '[t]his category is for disorders in learning that do not meet criteria for any specific Learning Disorder. This category might include problems in all three areas (reading, mathematics, written expression) that together *significantly interfere with academic achievement*.' Id. at 56."  Dschaak v. Astrue, 2011 WL 4498832, slip op. at 20, n.7 (D. Or. 2011)(emphasis added).

by the Woodcock-Johnson III Tests of Achievement, and her
academic potential as measured by the Wechsler Adult
Intelligence Scale - Third Edition.  The conditions underlying
Katie's diagnosis "significantly interfere with academic
achievement."  Dschaak v. Astrue, 2011 WL 4498832, slip op. at
20, n.7 (D. Or. 2011)(quoting DSM-IV at 56).

    The evidence before the Court, which Ross itself accepted
in providing what accommodations it did, clearly establish that
Katie "cannot read and process information in the condition,
manner or duration under which the average person can perform
that activity."  Rothberg v. Law School Admission Council, Inc.,
300 F. Supp. 2d 1093, 1104 (D. Colo. 2004), rev'd on other
grounds, 102 Fed. Appx. 122 (10th Cir. 2004).  See also Bartlett
v. N.Y. State Board of Law Examiners, No. 93 CIV 4986, 2001 WL
930792 (S.D.N.Y. 2001).  At the very least, a jury question is
presented.

    **E.   NJLAD**

    With respect to the NJLAD, defendants acknowledge that
"disability" is defined more broadly than under the ADA or
Section 504.  Indeed, the New Jersey Supreme Court in Andersen
v. Exxon Co., U.S.A., 89 N.J. 483, 495, 446 A. 2d 486 (1982),
made clear that even mild disabilities qualify for reasonable

accommodation.  The cases cited by defendants simply do not stand for the limiting propositions asserted.

### F.  **"Not Otherwise Qualified"**

Defendants' not-otherwise-qualified defense rests on the premise that Katie's requested accommodation of a live reader was unreasonable, and that she arbitrarily rejected the sufficient accommodation of a tape recorded reader.  For the following reasons, this argument also must be rejected.

To begin with, defendants have ignored the fact that, as an alternative to a live reader, Katie proposed that her professors be permitted to change the format of her exams so that the same questions could be asked in an essay or short answer format. Plaintiff's Answers to Interrogatories, Rubin Dec., Ex. A, pp. 10-11.  In fact, Ross's own policy permitted professors to determine the format of quizzes and examinations.  Wexler Dec., Ex. GG, p. 13, Section 2.5.1.  Katie had spoken with several of her professors about affording her this accommodation, including her microanatomy professor, Dr. Stimmelmyer, who told her that she would be happy to read the exam or change the format to a short answer format but, for reasons nowhere explained in the record, Ross's administration would not permit it.  Plaintiff's Answers to Interrogatories, Rubin Dec., Ex. A, pp. 10-11.

As for the live reader, Ross's claims of unreasonableness are specious.  As explained above, the credibility of Ross's

reasons for denying this accommodation are highly suspect in light of the contrary reasons provided in discovery.  Even if they were the true reasons (which they were not), Ross's concerns could have easily been addressed by having the reader sit behind her to avoid giving non-verbal cues, or having a witness present to validate the integrity of the process. Declaration of Katherine Archut.   While someone familiar with proper pronunciation surely would have been helpful, it was not essential.  As Katie explains in her declaration, as long as she knew in advance that those words would be skipped over, and the balance of the recitation were intelligible, she would be able to follow along.  Id.

### G.  Untimeliness of Documentation

Ross contends that, even if a live reader were required, Katie never documented it in a timely fashion.  This contention requires little comment.  We acknowledge that the disability documentation initially provided by Berger at WVU did not mention live reader as an accommodation that Katie was afforded there.  However, Katie explicitly told Artemiou at their meeting during the first week of class in January that she had received this accommodation for multiple choice exams, and was requesting it at Ross.  Because Ross misplaced Katie's documentation from WVU on two occasions, it was not until mid-March, as the semester was approaching a close and Katie already was

floundering academically without her accommodations, that Ross informed her of this discrepancy for the first time.  Berger promptly furnished the omitted information, but the watered-down accommodation provided by Ross in response was too little too late.

Bingham, the admissions officer at Ross's New Jersey headquarters where Katie's records were lost initially, acknowledged in his deposition that Ross had misplaced students' records approximately 5-10 times over the past several years, Deposition of William Bingham, Rubin Dec., Ex. D, T:18-5 to 18, that these records are protected by student privacy laws, that losing them is "a very serious thing," and that Ross has no procedures in place for safeguarding the records in light of Ross's track record.  Id., T:25-3 to T:26-13.

A reasonable jury could find that, had Ross not lost Katie's disability twice through its reckless record-keeping practices, Katie would have learned of the omission from her WVU records no later than her meeting with Artemiou during the first week of class in January.  The matter would have been rectified as promptly as it was when the omission was eventually discovered in March, and there would have been ample time to provide Katie with the accommodations she needed in plenty of time for her to succeed.  That did not happen solely due to Ross's wrongdoing.

Even if Ross could persuade the Court that Katie failed to provide the necessary documentation in time to provide the accommodation for her first semester, they have provided no explanation for why it would not have been timely in terms of the accommodations offered to Katie upon the grant of her appeal in May.

### H.  The Interactive Process

As for abandoning the interactive process, it is clear from the evidence that there was none.  The ADA, Section 504 and NJLAD all disapprove a one-size-fits all approach to student disability accommodations.  Educational institutions are required, through an interactive process, to conduct an individualized assessment of a student's needs, and to tailor reasonable accommodations likely to address the particular student's disability.  Sandquist was the individual who ostensibly trained Artemiou for her position, and acknowledged in her deposition that Ross approached disability accommodations in precisely the one-size-fits-all fashion prohibited by law, allowing two and only two accommodations:  time and a half for examinations, and a room with minimal distractions. Deposition of Jane Sandquist, Rubin Dec., Ex. B, T:23-14 to T:25-18.  The fact that Ross's disability request form limits choices to those two options speaks volumes.  Wexler Dec., Ex. J.

Sandquist further admitted that Ross's approach was not to accommodate the particularized needs of individual students, but to offer only accommodations that "fit with [Ross's] program." Deposition of Jane Sandquist, Rubin Dec., Ex. B, T:19-10 to 23, T:25-11 to T:26-15.   Ross had in hand a detailed psycho-educational report describing Katie's condition in detail, Wexler Dec., Ex. N, but defendants have acknowledged that none of the decision-makers involved was competent to review or understand it, and that Sandquist, the only one who was competent to review it, was never consulted about it.   Ross also had access to Dr. Julie Baumberger, a nationally recognized student disabilities expert employed by Ross's medical school, but she was never consulted despite Ross's acknowledgment that there were no impediments to doing so.   Declaration of Dan Wright; Deposition of Sean Fox, Wexler Dec., Ex. D, T:125-4 to T:126-7.

We have furnished an expert testimony from Dr. Jane Jarrow, a nationally recognized authority in the administration of student disability accommodations at the college and graduate school level, Declaration of Jane E. Jarrow, painstakingly detailing the numerous ways in which Ross mishandled Katie's request from the start.   In the interest of brevity, we will incorporate Dr. Jarrow's findings here.   Suffice it to say that

36

the interactive process that Ross claims to have engaged in never took place.

## I. Common Law Contract Claim

Regardless of how Katie's statutory claims are resolved, she had a reasonable expectation that her right to reasonable accommodations would have been governed by well-established common law principles applicable to the relationship between a student and a college or university.  It has widely been held that this relationship is essentially contractual, that a student handbook creates reasonable expectations that may be judicially enforced, and that there is an implied covenant of good faith and fair dealing inherent in such documents.  See, e.g., Vurimindi v. Fuqua School of Business, 435 Fed. Apx. 129, 133 (3rd Cir. 2011);  Ross v. Creighton Univ., 957 F. 2d 410, 416 (7th Cir. 1992);  Havlik v. Johnson & Wales University, 509 F. 3d 25, 34-35 (1st Cir. 2007).

Based on the specific provisions of Ross's Student Handbook regarding non-discrimination against disabled students, the provision of disability accommodations and the conduct of examinations, and the ADA/Section 504 standards that Ross's officials professed in their depositions to follow whether legally required to or not, a jury could find that defendants' handling of Katie's disability accommodations violated her reasonable expectations.

37

## Conclusion

For the reasons presented above, defendants' motion for summary judgment should be denied.  Alternatively, should the Court be inclined to consider the reasons, offered for the first time on this motion, for denying Katie the accommodations requested, disposition of the motion should be held in abeyance pending further discovery.

Respectfully submitted,

**DAVID B. RUBIN, P.C.**
Attorney for Plaintiff


By:_/s/David B. Rubin____


Dated:  August 21, 2012