**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KATHERINE ARCHUT, | : No.: 3:10-cv-01681 (FLW)(TJB) |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| ROSS UNIVERSITY SCHOOL OF VETERINARY | : |
| MEDICINE; DeVRY INC.; a corporation of the State | |
| of Delaware, and ABC Corporations 1-5, being | : |
| fictitiously named subsidiaries of DeVry Inc., | : |
| | : |
| Defendants. | : |
| | : |
| | : |

**DEFENDANTS' REPLY MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

Dated: New York, New York
September 11, 2012                     Respectfully submitted,

                                      SEYFARTH SHAW LLP

                                      By _____s/Howard M.Wexler
                                          Howard M. Wexler
                                          Michael F. Marino
                                          Jacob Oslick
                                      620 Eighth Avenue, 32nd Floor
                                      New York, New York 10018-1405
                                      Main Office Number: (212) 218-5500
                                      Main Fax Number: (212) 218-5526
                                      hwexler@seyfarth.com
                                      mmarino@seyfarth.com
                                      joslick@seyfarth.com
                                      *Attorneys for the Defendants*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ...........................................................................................................2

I. The ADA and RHA Do Not Apply Extraterritorially ................................................2

II. The NJLAD Does Not Apply Extraterritorially.......................................................7

III.  Archut Is Not "Disabled"...................................................................................8

IV.  Archut Is Not Otherwise Qualified....................................................................10

V.  The Live Reader Was Unreasonable....................................................................11

VI. Ross Engaged In The Interactive Process...........................................................14

VII. Archut's Contract Claim Also Fails .................................................................15

CONCLUSION .....................................................................................................16

# TABLE OF AUTHORITIES

## CASES

*Accenture Global Ser's GmbH v. Guidewire Software Inc.,*
   691 F. Supp. 2d 577 (D. Del. 2010) ....................................................................12

*Asplundh Tree Expert Co. v. NLRB,*
   365 F.3d 168 (3d Cir. 2004) ..................................................................................6

*Assisted Liv. Assoc's of Moor'twn, L.L.C. v. Moor'twn Tp.,*
   996 F. Supp. 409 (D.N.J. 1998)............................................................................15

*Barnes v. Gorman,*
   526 U.S. 181 (2002) ...............................................................................................4

*Berckeley Inv. Group, Ltd. v. Colkitt,*
   455 F.3d 195 (3d Cir. 2006) .................................................................................15

*Bird v. Lewis & Clark College,* .............................................................................3, 4
   Civil No. 98-691-AA (D. Or. filed Oct. 19, 1999)

*Bowers v. NCAA,*
   151 F. Supp. 2d 526 (D.N.J. 2001)......................................................................7, 8

*Chanel, Inc. v. Gordashevsky,*
   558 F. Supp. 2d 532 (D.N.J. 2008)........................................................................9

*Dean-Hines v. Ross Univ. Sch. of Vet. Med.,*
   05-CV-3486, Docket No. 30 (D.N.J. Aug. 10, 2006) ...........................................6

*EEOC v. Arabian Am. Oil Co.,*
   499 U.S. 244 (1991)................................................................................................3

*Gonzales v. Nat'l Bd. Of Med. Exam'rs,*
   225 F.3d 620 (6th Cir. 2000) ..................................................................................9

*Halpern v. Wake Forest Univ. Health Sci.,*
   669 F.3d 454 (4th Cir. 2012) ................................................................................14

*King v. Bd. Of Control,*
   221 F. Supp. 2d 783 (E.D. Mich. 2002) .................................................................4

*Majka v. Prud. Ins. Co. of Am.*
  171 F. Supp. 2d 410 (D.N.J. 2001) ........................................................................ 1

*Mastonicola v. Principi,*
  2006 WL 3098763 (W.D. Pa. 2006) .................................................................... 11

*Morrison v. National Aust. Bank Ltd.,*
  130 S.Ct. 2869 (2010) .......................................................................... 1, 2, 3, 4, 5, 6

*Muller v. Exxon Research and En'g Co.,*
  345 N.J. Super. 595 (N.J. Super. A.D. 2001) ...................................................... 6

*Murphy v. Franklin Pierce Law Ctr.,*
  882 F. Supp. 1176 (D.N.H. 1994) ...................................................................... 10

*Papalini v. Sensient Colors, Inc.,*
  2012 WL 1345353 (D.N.J. 2012) .......................................................................... 8

*Peikin v. Kimmel & Silverman, P.C.,*
  576 F. Supp. 2d 654 (D.N.J. 2008) ...................................................................... 8

*Perod Ricard USA, LLC v. Bacardi USA, Inc.,*
  653 F.3d 241 (3d Cir. 2011) ................................................................................ 4

*Phillips v. St. George's Univ.,*
  2007 WL 3407728 (E.D.N.Y. 2007) ................................................................. 2, 4

*Seibert v. Quest Diag. Inc.,*
  2012 WL 1044308 (D.N.J. 2012) .......................................................................... 8

*Singh v. George Wash. Univ. Sch. Of Med. And Health,*
  508 F.3d 1097 (D.C. Cir. 2007) ............................................................................ 9

*Sossamon v. Texas,*
  131 S.Ct. 1651 (2011) .......................................................................................... 4

*Taylor v. Phoenixville Sch. Dist.,*
  184 F.3d 296 (3d Cir. 1999) ............................................................................... 11

*Victor v. State,*
  203 N.J. 383 (N.J. 2010) ......................................................................... 11, 12, 14

*Walton v. Mental Health Ass'n of Se. Pa.,*
    168 F.3d 661 (3d Cir. 1999) ................................................................6

*Weisberg v. Riverside Tp. Bd. Of Educ.,*
    180 Fed. App'x. 357 (3d Cir. 2003) .................................................10

*Williams v. Phila. Housing Auth.,*
    380 F.3d 751 (3d Cir. 2004) ............................................................10

*Wong v. Regents of Univ. of Cal.,*
    410 F.3d 1052 (9th Cir. 2005) ............................................................9

*Wynne v. Tufts Univ. Sch. Of Med.,*
    976 F.2d 791 (1st Cir. 1992)............................................................14

## STATUTES

Fed. R. Civ. P. 8(b)(6)................................................................................9

N.J. Stat. 10:5-5(I)......................................................................................8

N.J. Stat. 10:5-5(q)......................................................................................9

29 C.F.R. § 1630.9(d) ...............................................................................10

29 U.S.C. § 794(a) ..................................................................................2, 4

42 U.S.C. § 12112(c)(2)(A) ...................................................................2, 3

42 U.S.C. § 12181-12189 ...........................................................................3

## OTHER AUTHORITIES

*Re: Ariz. State Univ.,*
    Case No. 08012047(Dep't of Educ. , Dec. 3, 2001)........................3, 5

<u>**PRELIMINARY STATEMENT**</u>

Katherine Archut's opposition brief raises no issues of fact.  Indeed, her

brief is remarkable for what it does not even *attempt* to dispute.  In particular:

- Archut does not dispute that the RHA and ADA Title III do not contain a "clear indication" of extraterritorial effect.  In fact, she concedes that these statutes "do not explicitly address" extraterritoriality. (Pl. Br. at 16.)

- Archut does not dispute that if "a statute gives no clear indication of an extraterritorial application, it has none."  *Morrison v. National Aust. Bank Ltd.*, 130 S.Ct. 2869, 2878 (2010).

- Archut does not dispute that she is *not* "substantially limited" in learning, reading, or any major life activity, nor limited in the "normal exercise of any bodily or mental function."  (*Compare* Def. Br. 22-264 *to* Pl. Br. at 29-32.) Thus, Archut is not "disabled" under the RHA, ADA, or NJDLAD.

- Archut does not dispute that Ross offered her a reasonable accommodation (tape recorded exams) that fulfilled her documented need to have material "presented auditorally."  (*Compare* Def. Br. 26-29 *to* Pl. Br. 32-33.)

- Archut does not dispute that one who rejects a reasonable accommodation is no longer "qualified."  (*Compare* Def. Br. 26-27 *to* Pl. Br. 32-33.)

- Archut does not dispute that she never documented needing a live reader, just an "audio accommodation."  (*Compare* Def. Br. 32-34 *to* Pl. Br. 33-37.)

- Finally, Archut does not dispute that St. Kitts law covers her contract claim, yet would not recognize it.  (*Compare* Def. Br. 38 *to* Pl. Br. 37.)

By not addressing these points, Archut has conceded them.  *Majka v. Prud.*

*Ins. Co. of Am.*, 171 F. Supp. 2d 410, 414 (D.N.J. 2001).  As many of them wholly

dispose of Archut's claims, summary judgment is warranted.  In any event, her

brief raises only red herrings, such as grumbling about phantom "inconsistencies."

It identifies no issues of material fact because none exist.

- 1-

<u>**A**RGUMENT</u>

**I.     The ADA And RHA Do Not Apply Extraterritorially.**

Archut first argues that the RHA and Title III of the ADA apply in St. Kitts. She acknowledges that none of these statutes "explicitly" apply abroad, (Pl. Br. 16), but argues that extraterritoriality can be *implied*. She is wrong.

Although Archut tries to complicate it, the extraterritoriality analysis is quite simple. Under *Morrison*, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." 130 S.Ct. at 2878. Here, Archut points to *nothing* in the statutory text or legislative history to support that Congress "clearly expressed" a desire for them to apply abroad. *Id.* at 2877-78. This is not surprising, because no "clear indication" of extraterritorial effect exists.

The RHA limits itself to "individual[s] . . . in the United States." 29 U.S.C. § 794(a); *see also Phillips v. St. George's Univ.*, 2007 WL 3407728, at *4 (E.D.N.Y. 2007) (Title IX does not apply abroad because it limits itself to "person[s] in the United States"). As for the ADA, its extraterritorial provisions cover only *employment* under Title I, not public accommodations under Title III. *See* 42 U.S.C. § 12112(c)(2)(A). And "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *Morrison*, 130 S.Ct. at 2883.

Unable to locate any "clear indication" of extraterritorial reach in the statutes

or legislative history, Archut tries to conjure one through district court holdings that don't survive *Morrison* and misguided policy considerations.  (Pl. Br. 20.)

First, Archut argues that RHA applies abroad because it has broad language about covering "all" operations, (Pl. Br. 14; *see also* 18-19), but boilerplate "broad language" does not rebut the presumption against extraterritoriality.  *Morrison*, 130 S.Ct. at 2882; *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 251 (1991).  Indeed, in *Morrison*, the statute covered "any person," and referred to "foreign commerce," but did not apply extraterritorially.  *Id.* at 2882.

Second, Archut contends that Ross is the same entity as DeVry Inc., but not by "piercing the corporate veil."  She merely points to public filings that reflect a normal parent-subsidiary relationship.[1]  (Pl. Br. 15-16.)  In any event, while the ADA's *employment* provisions reach "employers" who "control" foreign companies, its public accommodation sections do not contain a similar "control" provision.  *Compare* 42 U.S.C. § 12112(a) *with* 42 U.S.C. §§ 12181-12189.  Beyond that, the ADA and RHA do not apply extraterritorially to universities *at all*, even to *American* universities.  *See Re: Ariz. State Univ.*, Case No. 08012047.

Third, citing *Bird v. Lewis & Clark Coll.* (Rubin Decl. Ex. M), Archut argues for an "exception" to the presumption against extraterritoriality for statutes enacted "under the Spending Clause." (Pl. Br. 17).  But, in *Morrison*, the Supreme

---

[1] For this reason, her claims against DeVry fail as a matter of law.  (Def. Br. 39.)

Court held that courts must "apply the presumption in all cases." 130 S.Ct. at 2881.

Fourth, citing *Bird*, Archut argues that Ross agreed to a "contract" under the RHA to provide reasonable accommodations.  (Pl. Br. 17.)  But the Spending Clause does not "expand liability beyond . . . non-spending statutes"  *Sossamon v. Texas*, 131 S.Ct. 1651, 1661 (2011).  Even if a "contract" existed, Ross had no "contractual" RHA liability.  Contracts are interpreted according to their "ordinary and popular meaning."[2]  So any RHA "contract" would only cover conduct "in the United States." 29 U.S.C. § 794(a); *see Phillips*, 2007 WL 3407728 at *5.

Fifth, citing *Bird*[3], Archut argues that Ross's argument would render overseas students "floating sanctuaries from authority."  Wrong.  They would enjoy protections under the foreign country's law - just as foreigners in the U.S. benefit from our law.  Regardless, *Morrison* criticized courts for treating extraterritoriality questions as "matters of policy," instead of Congressional intent. 130 S.Ct. at 2880.  And it did so for a good reason.  While some policy reasons will always support extending American law to foreign countries, others favor

---

[2] *Perod Ricard USA, LLC v. Bacardi USA, Inc.* 653 F.3d 241, 251 (3d Cir. 2011); *see also Barnes v. Gorman*, 536 U.S. 181, 186 (if Congress wishes to impose conditions on accepting federal funds, "it must do so unambiguously" so that "the [recipient] voluntarily and knowingly accepts the terms of the 'contract'").

[3] *Bird* and *King v. Bd. of Control*, 221 F. Supp. 2d 783 (E.D. Mich. 2002) are also distinguishable.  Both concerned American universities that operated overseas programs.  Ross is a foreign university with no locations in the U.S..  *See Philips*, 2007 WL 3407728 at *5.

- 4-

keeping our law confirmed to our borders - including the need to foster friendly foreign relations by not trampling another country's sovereignty.

Sixth, Archut speculates that Congress would want these statutes to reach foreign public accommodations.  (Pl. Br. 19.)  But "judicial-speculation-made-law" cannot serve as the basis for extending American statutes abroad.  130 S.Ct. at 2881.  Indeed, one could more plausibly speculate that Congress didn't want to extend the accommodation obligation to foreign universities because, when Congress *actually* amended the ADA, it intentionally limited the statute's extraterritorial reach to *employment*.

Seventh, Archut claims that the OCR letters create a "welter of confusion." (Pl. Br. 20).  They do not.  The opinions Archut cites do not discuss extraterritorial reach.  The only time the OCR has expressly opined on extraterritoriality, it rejected its application.  *See Re: Ariz. State Univ.*  In any event, a "welter of confusion" is the polar opposite of the requisite "clear indication" of intent.

Eighth, Archut argues that Ross's conduct supports extending these statutes abroad.  (Pl. Br. 21-22.)  Again, she is wrong.  The "program participation agreement" she references requires Ross to adhere to Title IV of the Higher Education Act, as a condition of receiving Title IV funds.  It says nothing about the RHA and ADA, because the Department of Education does not condition federal funds on a foreign university's compliance with the RHA and ADA.  The 2008

- 5-

14830109v.1

Student Handbook she cites recognizes that *some* U.S. laws cover Ross and its

students (Ross has never argued otherwise), but does not include the RHA, ADA,

or NJLAD among them.  And, while Ross has always tried to offer

accommodations in accord with the ADA and RHA, there is nothing unusual about

*voluntarily* attempting to meet higher standards than legally *required*.  Nor can

doing *more* than what's legally required create statutory rights that otherwise

would not exist.[4]

Ninth, Archut argues that *Dean-Hines* cannot be distinguished.[5]  She cannot

dispute that *Dean-Hines* analyzed extraterritoriality using a "contacts" approach

the Supreme Court rejected in favor of a focus on Congressional intent.  *Morrison*,

130 S.Ct. at 2877-79 (rejecting an "effects test" and "conduct test").  *Asplundh*

*Tree Expert Co. v. NLRB*, 365 F.3d 168, 178 (3d Cir. 2004) (a "balancing of

contacts" cannot support extraterritoriality).  Nor can she dispute that *Dean-Hines*

was decided at the pleadings stage, not summary judgment.

Finally, Archut argues that this case involves New Jersey conduct, because

---

[4] *See Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 671 (3d Cir. 1999)
(employer who "exceeded the level that the law required" did not need to continue
offering an overly burdensome, unreasonable accommodation); *Muller v. Exxon
Research and En'g Co.*, 345 N.J. Super 595, 606 (N.J. Super. A.D. 2001) (same)

[5] Archut disingenuously claims that Ross did not provide a "truthful response" to
her interrogatories by not disclosing *Dean-Hines.*  This argument is baseless.  Ross
made clear that it limited its response to the "relevant time period," and Archut
never sought to compel a more complete response.  (Rubin Decl. Ex. L p. 13.)

- 6-

Ross's New Jersey office allegedly "lost" her documentation, preventing her from

getting "the help she so desperately needed."  (Pl. Br. 23-24.).  Even if Ross's New

Jersey office misplaced some documents (indisputably, it did not[6]), that is not

discrimination.  All the allegedly discriminatory conduct took place in St. Kitts.[7]

## II.     The NJLAD Does Not Apply Extraterritorially.

Archut also argues that the NJLAD applies to Ross under *Bowers v. NCAA*,

151 F. Supp. 2d 526, 533-534 (D.N.J. 2001).  Archut's reliance is misplaced.

First, *Bowers* is distinguishable.  The *Bowers* plaintiff was a New Jersey

resident, while Archut was a West Virginia citizen who resided in St. Kitts.  (Rule

56.1 Stmt. ¶¶ 21-22.)  The New Jersey legislature might, theoretically, have

intended to protect New Jersey "inhabitants" traveling in foreign countries.  *See*

N.J. Stat. 10:5-3.  It had no similar interest in protecting West Virginia citizens.

Second, *Bowers* does not reflect current New Jersey law.  *Bowers* held that

the NJLAD extended out-of-state unless a defendant's lack of "contacts" with the

---

[6]  Archut claims that Ross "lost" her documentation twice.  It did not.  The record
shows that Rebecca Berger only sent Ross *letters* on December 11 and January 15,
which neither mentioned a live reader nor included documentation, because Berger
"underst[ood] that Katie" would provide it.  (Wexler Decl. Ex. G.; Rule 56.1 Stmt.
59-62; Pl. Dep. Tr. 92.)  Ross informed Archut that Berger sent no documentation,
and that it needed "evaluation reports" from her. (Wexler Exs. L, M.)  Perhaps
Archut believes that Ross "lost" her documentation because Berger did not send it.
But her confusion does not raise a dispute of material fact.

[7] The crux of Archut's case is she did not receive a live reader even *after* supplying
two reports (neither of which recommended a "live reader").  It is mere speculation
to suggest that Ross might have acted differently if Archut had sent them sooner.

state would make applying it "arbitrary or unfair," or would violate Due Process. *Id.* at 531-37.  Since *Bowers*, however, courts have consistently recognized that the NJLAD applies "only to New Jersey employees" or to "wrongdoing directed at or committed in the State."[8]  Mere "contacts," such as a N.J. headquarters, are irrelevant.  *See Seibert v. Quest Diag. Inc.*, 2012 WL 1044308, at *3 (D.N.J. 2012).

Third, as subsequent cases show, *Bowers* was wrongly decided.  *Bowers* reasoned that the NJLAD could apply extraterritorially because "courts have de-emphasized the importance of the physical situs of the public accommodation." 151 F. Supp. 2d. at 533.  But *Bowers* relied on cases that concerned non-physical social organizations, such as the Boy Scouts and Little League, which serve New Jersey residents in New Jersey.  *Id.*  Applying the NJLAD to a non-physical public accommodation is very different than extending it to a university located in a foreign country.  In fact, the NJLAD expressly limits its reach to universities that, unlike Ross, are supervised by New Jersey state bodies.  N.J. Stat. 10:5-5(l).

## IV.   <u>Archut Is Not "Disabled".</u>

Summary judgment is also appropriate because Archut is not "disabled" under the ADA, RHA, or NJLAD.  Glaringly, Archut's opposition papers do not even *identify* any major life activity where she's "substantially limited," or attempt to explain how she lacks "the normal exercise of any bodily or mental function."

---

[8] *Papalini v. Sensient Colors, Inc.*, 2012 WL 1345353, at *3 (D.N.J. 2012); *Peikin v. Kimmel & Silverman, P.C.*, 576 F. Supp. 2d 654, 657 (D.N.J. 2008).

(Pl. Br. 29-32); N.J.S.A. § 10:5-5(q).  Thus, Archut does not even truly *argue* that she's "disabled," much less provide *evidence* to support this contention.

In fact, Archut admits that her disorder "has nothing to do with [her] ability to learn," that her "reading ability" is "good," and that she learned "the stuff inside and out" despite Ross's heavy reading load. (Rule 56.1 Stmt. ¶¶ 27, 46, 109-10; Def. Br. 21-26.)  Faced with her admissions, and unable to evidence a statutory "disability," Archut tries to manufacture issues of fact through red herrings.  For instance, she claims that Ross's Answer "never denied that Katie was 'disabled." (Pl. Br. at 28.)  But her Complaint alleged only that she had "a handicap within the scope of § 504."  (*Id.* ¶ 48.)  Indisputably, whether Archut had a statutory "handicap" calls for a "legal conclusion" to which "no response is required." (Answer ¶ 48); *Chanel, Inc. v. Gorda'sky*, 558 F. Supp. 2d 532, 536 (D.N.J. 2008) (no need to respond to "conclusions of law").  And "[i]f a responsive pleading is not required, an allegation is considered denied." Fed. R. Civ. P. 8(b)(6).

Archut also argues that she is "disabled" by comparing her "academic performance" to her own "academic potential."  (Pl. Br. 30-31.)  But that's the wrong comparison.  The proper metric is whether Archut's "limitation is substantial as compared to the average person in the general population."[9]  Her

---

[9] *Singh v. George Wash. Univ. Sch. of Med. and Health*, 508 F.3d 1097, 1100 (D.C. Cir. 2007); *Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1066 n.6 (9th Cir. 2005).

limitation must be "substantial," not merely "low average" or "below average."[10]
Here, while Archut may have suffered from a "Learning Disorder NOS" (*i.e.*, "not
otherwise specified") her own admissions refute any suggestion that she faced a
substantial limitation in learning or reading, as compared to the average person.

Archut further argues that "Ross itself accepted" her documentation and
provided "disability accommodations." (Pl. Br. 30.) But "an offer of
accommodation does not, by itself, establish that [Ross]'regarded' [Archut] as
disabled." *Williams v. Phila. Housing Auth.*, 380 F.3d 751, 776 n. 20 (3d Cir.
2004). Here, the evidence shows that Ross extends accommodations to students
with learning conditions that might impact their educational experience, even if
these students might not be "disabled." (Rule 56.1 Stmt. ¶ 128.)

IV.   Archut Is Not Otherwise Qualified.

Archut also fails to raise a triable issue of fact over whether she is a
"qualified individual with a disability." As Ross's opening brief explained, Archut
is not "qualified" because she failed *after* receiving a reasonable accommodation
(tape-recorded exams), and then rejected Ross's offer to continue providing that
accommodation. Once an individual rejects an offered reasonable accommodation
or fails despite receiving one, "the individual will not be considered qualified." 29
C.F.R. § 1630.9(d); *Murphy v. Franklin Pierce Law Ctr.*, 882 F. Supp. 1176, 1182

---

[10] *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 629-630 (6th Cir. 2000);
*Weisberg v. R'side Tp. Bd. of Educ.*, 180 Fed. App'x. 357, 358-59 (3d Cir. 2003).

- 10-

(D.N.H. 1994) (plaintiff not qualified because she failed classes after receiving "accommodations suggested by her physician"); (*see also* Def. Br. 26-29).

In response, Archut does not *attempt* to dispute that the tape recorded exams qualified, *as a matter of law*, as a reasonable accommodation, because they met her need to have material "presented auditorally."  (Rule 56.1 Stmt. ¶ 83); *Victor v. State*, 203 N.J. 383, 423 (N.J. 2010).  Instead, she argues that the tape recordings were not ideal because the sound quality was poor (a complaint she never made to Ross), her professors had accents, and - *upon her explicit request* - they spoke slowly.  (Pl. Br. 12; Rule 56.1 Stmt. ¶¶ 105-06.)  But accommodations are reasonable even if not "ideal."  *Mastonicola v. Principi*, 2006 WL 3098763, at *5-6 (W.D. Pa. 2006).  And, if Archut *actually* had issues with the recordings' sound quality, she needed to tell Ross that at the time.  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317 (3d Cir. 1999) ("an employer cannot be faulted" if employee "fails to supply information" that is needed to assess suitable accommodations).  She did not.  Instead, she told Ross that the recordings were "fine" and only "slightly different than a live reader," just read too fast.  (Rule 56.1 Stmt. ¶ 104.)

## V.   The Live Reader Was Unreasonable.

As Ross's opening brief explained, a live reader would have been either outrageously costly (*i.e.,* flying in retired veterinarians to St. Kitts), or would have fundamentally altered Ross's academic program (by potentially giving Archut an

unfair advantage, while depriving Ross of the professors it used to proctor exams for all other students).  (Def. Br. 29-32.)  Beyond all that, Archut never specifically documented needing a reader; she only documented support for an "audio accommodation."  (*Id.* 32-34.)  Archut's opposition papers supply no *evidence* to rebut Ross's explanations.  She does not, for instance, identify a single scrap of paper or line of testimony showing that Ross could have provided a live reader at little cost or burden.  Instead, Archut merely substitutes her judgment for Ross's.

For instance, Archut feigns surprise at Ross's explanation that cost, burden, and test fairness issues drove its decision not to offer a live reader.  (Pl. Br. 25-27.) But Ross had always told her that it did "not have the resources," and was not "equipped" to provide "reader accommodation."  (Rubin Decl., Ex. D. at 11-12; Archut Dep. Tr. 165.)  And Dr. Fox's deposition recounted that Ross provided tape recordings instead of a live reader so that the technical terms used on exams "were pronounced correctly to her," while ensuring she "didn't have an advantage because of some nonverbal cue" from a live reader.  (Fox Dep. Tr. 110-111.) Moreover, Ross's interrogatory responses noted that Ross offered tape recorded exams (negating any theoretical need to offer a more burdensome accommodation, *see Victor*, 203 N.J. at 406), and referred to documents that reflected Archut's failure to substantiate a need for a "live reader."  Thus, Archut had more than "adequate notice" of Ross's reasons, despite her own failure to question Dr. Guy

St. Jean thoroughly at deposition.  *See Accenture Global Serv's GmbH v. Guidewire Software Inc.*, 691 F. Supp. 2d 577, 587 (D. Del. 2010).

Archut also claims that Ross did not need its professors to proctor exams in order to answer questions, because it precluded student questions during exams. (Pl. Br. 27-28.)  But the very policy that Archut cites contains numerous examples of permitted questions.  (Pl. Op. Br. 28.)  In any event, Ross also used professors as proctors to guard against cheating.  (Rule 56.1 Stmt. ¶ 94.)

Archut further argues that Ross's reasons are "inconsistent" with Dr. Fox's testimony.  (Pl. Br. 26.)  They are not.  Dr. Fox testified that Ross previously hadn't offered reader accommodation because he understood that they were not provided on national licensing exams.  (Fox Dep. Tr. 91-92.)  After Dr. Fox learned that he was mistaken, Ross elected to provide audio accommodation (*i.e.*, tape recordings) but not a live reader.  Dr. St. Jean's Declaration explains why.

Archut also attempts to discount Ross's cost and burden concerns.  She now claims, in her Declaration, that she did not need someone familiar with technical veterinary vocabulary.  (Archut Decl. ¶ 4.)  But, back in 2008, Archut demanded "a qualified reader," who "understands the subject matter, can pronounce the terms, speaks clearly and without accent, and will repeat or explain the questions as needed."  (Wexler Ex. BB at P00011.)  Similarly, Archut argues that Ross could have hired "a witness" to "vouch for the integrity" of the live reader.  (Archut

- 13-

Decl. ¶ 4.)  But hiring a witness would only have *increased* a live reader's cost.

Lastly, Archut contends that Ross could have accommodated her in other ways.  Archut's first suggestion, using a "realistic" computer program, was never mentioned before her Declaration.  (Archut Decl. ¶ 5.)  And even if such a program exists today, there is no evidence that it existed in 2008, or was compatible with Ross's systems.  Archut's second suggestion, oral exams (Pl. Br. 32), was raised at the time, though not in her Complaint.  But Ross had the right, in its "professional, academic judgment," to decide that changing its exam format would have imposed "an undue (and injurious) hardship to its academic program." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 795 (1st Cir. 1992); (Archut Dep. Tr. 137-139.)  In any event, having offered one reasonable accommodation, Ross did not need to offer Archut her preferred alternative.  *Victor*, 203 N.J. at 424.

Beyond all that, the live reader was not "reasonable" for still another reason:  Archut flunked out of Ross even *after* receiving the "audio accommodation" called for in her documentation.  It is sheer speculation to believe that Archut would have received a different result with a live reader as opposed to tape recordings.  *See Halpern v. Wake Forest Univ. Health Sci.*, 669 F.3d 454, 465 (4th Cir. 2012) (accommodation is unreasonable if it has "uncertain likelihood of success").

VI.  Ross Engaged In the Interactive Process

Archut further claims that Ross eschewed the "interactive process" in favor

of a "one-size-fits-all" approach.  (Pl. Br. 34-35.)  The record reflects that Ross'

interactive dialogue with Archut was personalized.  (*See* Def. Br. 35-37.)

Unable to succeed on the facts, Archut instead proffers a purported expert

"report." (Pl. Br. 36-37.)  This report is just a thinly veiled legal opinion.  Dr.

Jarrow made no "findings."  (*Id.* 37.)  She simply "assume[d]" certain "facts," then

opined that Ross "failed . . . to meet its legal obligation" and is "guilty of

discrimination."  (*Id.* at 37; Jarrow Rep. at 1, 4, 7.)  As a matter of law, her report

is irrelevant and inadmissible.  *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195,

217-18 (3d Cir. 2006); *Assisted Liv. Assoc's of Moor'twn, L.L.C. v. Moor'twn Tp.*,

996 F. Supp. 409, 442 (D.N.J. 1998) (expert report on whether defendant offered

"reasonable accommodations" merely an impermissible "legal conclusion").[11]

VII.   Archut's Contract Claim Also Fails

Archut's Complaint also alleges a "breach of actual or implied contract,"

based on Ross's Student Handbook.  This claim is baseless.  (Def. Br. 38-39.)  Any

such claim would be governed by St. Kitts law, because it would arise out of a

document published by a St. Kitts entity, for the purpose of describing policies in

place at its St. Kitts campus.  And Ross's Student Handbook created no contractual

rights under St. Kitts law.  (*Id.*)  But even if it somehow did, nothing in the Student

Handbook obligated Ross to provide a live reader.  (*Id.*)

---

[11] Archut also says that Ross could have consulted Dr. Julie Baumberger.  She
worked for a different entity, in a different *country* (Dominica). (Wright Decl. ¶ 6.)

<u>C</u><u>ONCLUSION</u>

Summary judgment should be granted in its entirety.

Dated: New York, New York
           September 11, 2012                    Respectfully submitted,
                                                 SEYFARTH SHAW LLP

                                                 By ____ s/Howard M.Wexler
                                                      Howard M. Wexler
                                                      Michael F. Marino
                                                      Jacob Oslick
                                                 620 Eighth Avenue, 32nd Floor
                                                 New York, New York 10018-1405
                                                 Main Office Number:  (212) 218-5500
                                                 Main Fax Number:  (212) 218-5526
                                                 hwexler@seyfarth.com
                                                 mmarino@seyfarth.com
                                                 joslick@seyfarth.com
                                                 *Attorneys for the Defendants*