**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

KATHERINE ARCHUT,                    CIVIL ACTION NO. 10-1681 (MLC)

    Plaintiff,                      **MEMORANDUM OPINION**

    v.

ROSS UNIVERSITY SCHOOL OF
VETERINARY MEDICINE, et al.,

    Defendants.

I.        **BACKGROUND**
        **A. College**
        **B. Veterinary School**
II.      **ANALYSIS**
        **A. Extraterritoriality**
            **i.   RHA and Ross**
            **ii.  ADA and Ross**
            **iii. NJLAD and Ross**
            **iv.  Anti-Discrimination Statutes and DeVry**
        **B. Jurisdiction**
III.  **CONCLUSION**

Plaintiff, Katherine Archut ("Archut"), brought this action against Defendants, Ross University School of Veterinary Medicine ("Ross") and DeVry, Inc. ("DeVry") (collectively, "Defendants"), alleging disability discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 794 ("RHA"), the Americans with Disabilities Act, 42 U.S.C. § 12181 ("ADA"), and the New Jersey Law Against Discrimination ("NJLAD"), as well as alleging common law claims of breach of contract.  (See dkt. entry no. 1, Compl. at ¶¶

1, 47, 54, 60.)[1]  Defendants move for summary judgment in their favor on all claims.  (See dkt. entry no. 32, Defs.' Mot. for Summ. J.)

The Court grants Defendants' motion in part because the anti-discrimination laws allegedly violated in this case do not apply extraterritorially to conduct in St. Kitts, and denies the motion as to the common law claims of breach of contract.

## I.    BACKGROUND

Archut, a former veterinary student, brought this action alleging failure to reasonably accommodate against Ross, a veterinary school in St. Kitts and Nevis, and DeVry, its parent company.  (See dkt. entry no. 32-2, Defs.' Statement of Undisputed Material Facts at ¶ 3 (hereinafter "Defs.' Statement").)[2]  Archut attended Ross from January 2008 until April 2008.  (Id. at ¶¶ 28, 112.)

---

[1] Ross is identified as "Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited" in Defendants' Brief in Support of the Motion for Summary Judgment. (See dkt. entry no. 32-1, Defs.' Br. in Supp. of Mot. for Summ. J. at 1.)

[2] Citations to Defendants' Statement of Undisputed Material Facts only include those facts that Plaintiff has failed to dispute, unless otherwise noted.  See L.Civ.R. 56.1(a) ("any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion"); Smith v. Addy, 343 Fed.Appx. 806, 808 (3d Cir. 2009).  We thus, after ensuring that the parties' respective statements of fact accurately summarize the evidence of record, provide citation to their statements.

Ross is a corporation organized under the laws of the Federation of St. Kitts and Nevis.  (Id. at ¶ 1.)  The school operates on St. Kitts, receiving some administrative support from an office in New Jersey.  (Id. at ¶¶ 3, 6.)  All decisions regarding reasonable accommodations for students are made by administrators working for Ross on St. Kitts.  (Id. at ¶¶ 6-7.)  Archut is a Virginia native, who received a college education at West Virginia University ("WVU") in West Virginia before applying to Ross.  (Id. at ¶¶ 13-15.)  After she left Ross, Archut moved to North Carolina.  (Id. at ¶ 19.)

### A.   College

After Archut's first semester of college, she was tested for a learning impairment and eventually diagnosed with certain "processing" impairments.  (Id. at ¶¶ 24-25.)[3]  Archut received a four-page report with highly detailed descriptions of her testing results.  (See Pl.'s Opp'n Statement at ¶ 25.)  According to the report, Archut has an adequate level of development in verbal skills, which include verbal reasoning ability, meaningful grouping of information, mental computation, application of conventional behavioral standards, and general fund of information.  (See dkt.

---

[3] Archut describes her diagnosis as it was characterized in the report that was issued following her psycho-developmental evaluation.  (See dkt. entry no. 37, Pl.'s Statement of Material Facts in Opp'n at ¶ 25 (hereinafter "Pl.'s Opp'n Statement").)  The report labeled Archut as having "Axis I 315.9 Learning Disorder NOS."  Id.

entry no. 32-14, Decl. of Howard M. Wexler, Ex. N, at RUVM00117.)
Archut was also described as having "a well developed ability to
reason abstractly with visual information, and to sequence visual
information." (Id.)  Archut has adequately developed her abilities
in visual organization, differentiation between essential and
nonessential details, and visual-motor coordination.  (Id.)
Relative to her other performance abilities, Archut's ability to
process information is considerably lower.  (Id.)

    After discovering these impairments, Archut met regularly with
her academic support advisors and sought several accommodations,
including extra time on exams, a quiet room, and the use of a
calculator.  (Defs.' Statement at ¶ 28.)  Archut did not have
someone read her exams to her ("a live reader") until her fifth
semester in college, in the spring of 2006.  (Id. at ¶ 29.)  She
made limited use of this accommodation.  (Id. at ¶¶ 29-30.)  Archut
struggled academically at WVU:

- She withdrew from Organic Chemistry I and II.  (Id. at ¶ 34.)[4]
- She received Ds in Introduction to Chemistry and College Algebra.  (Id.)
- She received a C- in Introduction to Physiology.  (Id.)

_____

    [4] Archut denies that she performed poorly at WVU, countering
that she "did well enough to be admitted to Ross."  (Pl.'s Opp'n
Statement at ¶ 34.)  Archut did not dispute her actual grades in
the classes, however, and thus these may be considered as
undisputed facts for the purposes of this motion.  (Id. at ¶¶
32-35.)

- She received Cs in Plane Trigonometry, Introduction to Animal Physiology, Principles of Genetics, and General Microbiology. (Id.)
- She failed Animal Diversity while studying abroad at Murdoch University in Australia. (Id. at ¶ 35.)

During college, Archut applied to half a dozen veterinary schools in the United States and received rejections from all of them before applying to Ross. (Id. at ¶ 38.) Archut's application did not mention the live reader accommodation she had received at WVU; in her personal statement, however, she did mention her learning disability and the fact that she had received extra time on exams as an accommodation. (Id. at ¶ 40.)

B. **Veterinary School**

During the time period Archut was enrolled in Ross, she worked with several different administrators to secure testing and class accommodations.

On December 11, 2007, Rebecca Berger of WVU sent Bill Bingham of Ross information regarding Archut's learning impairments through Ross's Edison, New Jersey, office. (Id. at ¶ 42.) This faxed letter stated that Archut received "extra time for tests, quizzes and exams, extended time for in-class writing assignments, copies of visual aids during each class period, assistance from her professors in identifying note takers, the ability to tape-record lectures, the use of hand held calculators when appropriate, and periodic discussions with her professors." (Id.) The letter did

5

not mention a live reader and stated that Archut would be responsible for sending the most recent documentation of her impairments and need for accommodations.  (Id. at ¶¶ 43-44.)

Ross held a student orientation on January 2, 2008, where Archut was asked to complete a Personal Data Form with a section on disabilities.  (Id. at ¶ 45.)  Archut indicated on the form that she had dyslexia and required extra time for exams, but made no request for a live reader.  (Id.)  On the same form, Archut rated her reading ability as "good" and noted that she read over twenty books for leisure per year.  (Id. at ¶ 46.)

Ross commonly provides two kinds of accommodations, both of which Archut requested: extra time on exams and a room with minimal distractions.  (Id. at ¶ 54.)  Ross provides other accommodations upon student request, so long as the student fills out paperwork requesting such special accommodation and can produce supporting documentation.  (Id. at ¶¶ 55, 56.)[5]  Archut spoke with Ross's counselors about her accommodations on several occasions, including

_____

[5] Archut disputes that requests for other accommodations are granted at Ross.  (See Pl.'s Opp'n Statement at ¶ 55.)  Archut points to the transcript from the deposition of Defendants' witness Jane Sandquist, who could only remember one request for a different accommodation being granted, and that was merely an adaptation of the request for a room with minimal distractions. (Id. (citing Dep. of Jane Sandquist, Rubin Decl., Ex. B, T:19-5 to T:28-15.).) The Court is not persuaded that a genuine dispute of fact exists here because the school did provide other accommodations, as evidenced by Ross's agreement to tape-record Archut's exams. (See Defs.' Statement at ¶ 87.)

Elpida Artemiou, a student counselor responsible for handling accommodation requests. (Id. at ¶¶ 47, 48.) Archut was conditionally approved for testing accommodations on January 16, 2008, but was expected to provide supporting documentation. (Id. at ¶¶ 60, 61.) There was a miscommunication regarding who would provide the required "psycho-educational report" documenting the results of a comprehensive evaluation that identified and detailed Archut's specific learning disability. (Id. at ¶¶ 57-65.)[6]

Archut took her first multiple choice test on January 24, 2008. (Id. at ¶ 63.) She failed that one, and the majority of her first set of exams. (Id.) The parties dispute when Archut first requested a live reader: Archut claims the request came during multiple conversations with Artemiou from the start of February, while Defendants claim the request was made at the very end of the month, on February 27. (Id. at ¶¶ 66, 74.)[7]

After several meetings and emails, Archut produced the required documentation for an audio accommodation on March 21, 2008. (Id. at ¶¶ 67-71, 78-80, 81-87.) While Archut had specifically requested a live reader who could sit in the room and

---

[6] Archut disputes that the delay was solely due to a miscommunication, instead assigning blame to Ross's New Jersey office for losing the papers twice. (Pl.'s Opp'n Statement at ¶ 67.)

[7] In Archut's papers, she claims that the request for a live reader with multiple choice exams was in fact made during the first week of classes in January. (See dkt. entry no. 36, Pl.'s Br. in Opp'n to Summ. J. at 33 (hereinafter "Pl.'s Opp'n Br.").)

read the exams aloud to her, the documentation she provided only suggested that she would benefit from a more general audio accommodation.  (Id. at ¶¶ 83-84.)

Ross, on receiving medical documentation demonstrating that Archut needed an audio accommodation, offered to have all of Archut's exams tape-recorded.  (Id. at ¶ 87.)  The school did not provide Archut with the live reader she had requested.  (Id. at ¶ 88.)  When Ross offered to have Archut's exams tape-recorded, she still had one midterm in anatomy and all of her final exams to take, which were more heavily weighted in the grading scheme.  (Id. at ¶ 102.)  Ross gave Archut the tape-recording and headphones with freedom to pause, rewind, and repeat the recording as often as she liked during her exam.  (Id. at ¶ 103.)  Following her anatomy midterm, Archut informed Artemiou that "the recording for the last exam was fine," but that the reader spoke too quickly.  (Id. at ¶ 104.)  Archut asked that the next reader speak "much slower" with pauses between questions.  (Id.)  She stated that she found the recording only "slightly different from a live reader."  (Id.)  Artemiou spoke with the professors and secured Archut's requested changes.  (Id. at ¶¶ 105-07.)

Despite these accommodations, Archut failed Microscopic Anatomy & Embryology, Physiology, and Animal Nutrition, while passing Anatomy with a C.  (Id. at ¶ 108.)  Archut claims that,

while she learned all the material required to pass these courses, her test results do not reflect her knowledge.  (Id. at ¶¶ 109-11.)

On April 19, 2008, Archut was dismissed from Ross for poor academic performance.  (Id. at ¶ 112.)  After an appeal of her dismissal, Archut was readmitted on May 7, 2008, but she was told that she would have to retake any classes she had failed from her first year in order to remove the failing grades from her transcript.  (Id. at ¶¶ 113-17.)  Archut declined to return to Ross, applying instead to a master's program in Reproductive Physiology at North Carolina State.  (Id. at ¶ 118.)

## II.  ANALYSIS

Extraterritorial application of the RHA, ADA, and NJLAD is a threshold issue here.  The issue of extraterritoriality is one that concerns the merits of the action.  See Morrison v. Nat'l Austl. Bank, Ltd., 130 S.Ct. 2869, 2877 (2010); Animal Sci. Prods. v. China Minmetals Corp., 654 F.3d 462, 466-68 (3d Cir. 2011), cert. denied, 132 S.Ct. 1744 (2012).  The extraterritoriality inquiry asks whether a defendant's conduct can violate the statute if performed outside the physical jurisdiction of the United States. Morrison, 130 S.Ct. at 2883.  Accordingly, if a defendant is subject to United States law, then any allegation that that defendant has violated those laws can be brought before the federal courts because it falls within the courts' subject matter

jurisdiction.  The Court must first determine whether Defendants were subject to the statutes of the United States and New Jersey.

### A.    Extraterritoriality

Defendants argue that Archut's claims under RHA and ADA cannot "extend extraterritorially to cover Archut's claims" because those laws protect students facing disability discrimination only when the discriminatory acts occur within the United States.  (See dkt. entry no. 32-1, Defs.' Mem. of Law in Supp. of the Mot. for Summ. J. at 12 (hereinafter "Defs.' Mem.").)  Defendants claim that any alleged discriminatory conduct occurred within St. Kitts and was therefore beyond the reach of the domestic concern expressed when these statutes were crafted.  (Id. at 13.)

Archut responds that the scope of the inquiry is much broader, taking cognizance of "all available evidence" to determine whether Congress intended the statutes to have extraterritorial effect. (See Pl.'s Opp'n Br. at 14.)

There is a presumption against extraterritorial application of United States law where Congress failed to expressly communicate an intent to have the law apply extraterritorially.  Morrison, 130 S.Ct. at 2877-78, 2881.  This presumption derives from Congress's ordinary legislative concern with domestic, not foreign matters. Id. at 2877.  Courts should interpret statutes to conform to this expectation: "unless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial

10

effect, we must presume it is primarily concerned with domestic conditions." Id. The analysis begins with the text of the statute and may proceed to other contextual sources indicative of Congressional intent. Id. at 2883; see Keller Found./Case Found. v. Tracy, 696 F.3d 835, 844-46 (9th Cir. 2012).

The statute at issue in Morrison was § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78a ("Exchange Act"), which the foreign plaintiffs alleged was violated by foreign and American defendants in connection with securities traded on foreign exchanges. 130 S.Ct. at 2875. After close analysis of the text in the provisions and Congress's legislative purposes as stated in the Exchange Act, the Court concluded that the statute did not evince a Congressional intent to overcome the presumption against extraterritoriality. Id. at 2883. The Court noted that the presumption should not be transformed into a "clear statement rule," requiring each statute to include magic words to achieve extraterritorial application. Id. Rather, context can also be consulted to give "the most faithful reading" of the statute. Id.

### i.   RHA and Ross

The RHA does not apply extraterritorially. Neither the text of the statute, nor outside sources of context such as the legislative history or case law, communicate an affirmative intention of extraterritorial application that would give rise to liability for discriminatory acts occurring in a foreign country.

11

The RHA prohibits discrimination in any program or activity against any "otherwise qualified individual with a disability in the United States," solely because of that person's disability, by any institution that receives federal grants or financial assistance to any of the institution's programs or activities.  29 U.S.C. § 794.  A "program or activity" includes "all the operations of . . . a college, university, or other postsecondary institution."  29 U.S.C. § 794(b)(2)(A).

Archut argues that Ross is liable for violations of the RHA because the school accepts federal financial assistance and is closely bound to its parent company, DeVry, which is a United States entity.  Archut argues that Ross is subject to the RHA because of several contacts that Ross has with the United States: Ross's receipt of federal financial assistance, the close relationship between Ross and DeVry, the legislative history of the RHA, and Ross's Student Handbook.  (See Pl.'s Opp'n Br. at 13–23.)

Archut argues that Ross is bound to abide by the RHA because it offers federal financial aid to its students.  (See id. at 14.)  While Archut argues that the "program participation agreement" Ross signed acts as a contractual agreement to abide by all United States laws relating to disability discrimination, the agreement itself fails to mention any such contractual arrangement.  (See dkt. entry no. 38-8, Decl. of David B. Rubin, Ex. H (Exhibit J therein contains a "Foreign School Program Participation Agreement"

for the term June 2007 to June 2008).)  Dictating standards for American institutions after giving financial assistance is not equivalent to making the same demands of foreign institutions, however, even if the foreign schools received the same federal aid.

Congress must indicate that the statute was intended to have the same effect on foreign institutions receiving federal funds as on domestic ones.  Otherwise, the presumption against extraterritoriality dictates that the statute should be read with the assumption that Congress was only concerned with domestic institutions' anti-discrimination standards.  As the Court made clear in Morrison, Congress must provide an express communication of extraterritorial application in a statute; broad phrases such as "any program or activity receiving Federal financial assistance" give "uncertain indications" and do not suffice to overcome the presumption.  29 U.S.C. § 794; 130 S.Ct. at 2883.

Archut also claims that the remedial purposes of the statute support a broad reading.  (See Pl.'s Opp'n Br. at 18–19.)  Legislative history does show that Congress had the goal of "prevent[ing] discrimination in federal financial assisted programs" and "guarantee[ing] that there will be no discrimination among recipients of Federal financial assistance."  H.R. Rep. No. 88-914 (1963), reprinted in 1964 U.S.C.C.A.N. 2391, 2394.  The uncertain language in these phrases, however, does not require a conclusion that either "recipients" or "assisted programs" was

13

intended to encompass both domestic and foreign institutions.  The phrases are used generally, without indication that Congress meant "all programs wherever located" or "all recipients, whether foreign or domestic."  Where Congress speaks generally, the presumption requires courts to presume that Congress is concerned with domestic matters.  To overcome that presumption, there must be an affirmative indication in the statute to such effect.  Morrison, 130 S.Ct. at 2877–78.  Thus, the legislative history is not enough to overcome the presumption against extraterritoriality.

Archut cites several cases and opinion letters from the United States Department of Education, Office of Civil Rights ("DOE") that address the issue of American students studying abroad in programs run by American universities.  (See Pl.'s Opp'n Br. at 16–18, 20.) One case concerns a student from Lewis & Clark College who participated in a study abroad program in Australia run by the school.  Bird v. Lewis & Clark Coll., 104 F.Supp.2d 1271 (D. Or. 2000), aff'd, 303 F.3d 1015 (9th Cir. 2002).  The student brought suit alleging that the school failed to provide reasonable accommodations for her disability.  104 F.Supp.2d at 1274.  There, the defendant was a United States federally-funded, educational institution and, "[a]s a recipient of Federal financial assistance, there is no dispute that the college must comply with both the [RHA] and the ADA."  Id.  The district court did not address any extraterritorial dispute.  After the jury found for defendant

school, the student appealed the district court's denial of her motion for a new trial.  303 F.3d at 1021, n.1.  The defendant argued to the Court of Appeals for the Ninth Circuit that the ADA and RHA did not apply to its acts while in Australia because of the presumption against extraterritoriality.  Id.  The Court of Appeals declined to reach that issue and affirmed on the grounds that, when viewed as a whole, the program did reasonably accommodate the plaintiff's disability.  Id.

The Bird case brings little persuasive authority to the extraterritoriality issue here; the issue was not reached in Bird and the application of American law to an American university being sued by its American student is distinguishable from the case here. The same distinguishing facts also appear in King v. Bd. of Control, which dealt with Title IX: an American student sued Eastern Michigan University based on conduct that occurred during a five-week study abroad program in South America.  221 F.Supp.2d 783 (E.D. Mich. 2002).  Archut, much like King and Bird, is also a United States citizen, but unlike Lewis & Clark College or Eastern Michigan University, Ross is located in and accredited by a foreign country.  (See Defs.' Statement at ¶¶ 1-5.)

King carries even less persuasive weight than Bird because the district court relied on a case preceding Morrison — Foley Bros., Inc. v. Filardo, 336 U.S. 281 (1949).  See King, 221 F.Supp.2d at

787.   In Foley, the Court suggested that the extraterritoriality inquiry involves

> a broader search for indications of Congressional intent, a search which has as a rule encompassed a wide range of materials beyond the plain language of the statute. This is so because, as Foley makes clear, the court's task is to ascertain "unexpressed congressional intent."

King, 221 F.Supp.2d at 787 (quoting Foley, 336 U.S. at 285).   In Morrison, the Court explicitly disavowed a line of cases from the Court of Appeals for the Second Circuit that described the extraterritoriality inquiry as seeking to "ascertain" unarticulated Congressional intent from sources outside the text of the statute. 130 S.Ct. at 2878-81.

Archut cites decisions from the regional offices of the DOE that have read the statute to apply abroad.  (See Pl.'s Opp'n Br. at 19-20.)  In those three decisions, the DOE analyzed the merits of the students' complaints without addressing whether the anti-discrimination statute applied abroad.

In Husson College, the school was based in Maine, the study abroad program run by the school traveled to Honduras, and the faculty alleged to have discriminated against the complainant were located and made their decisions in Maine.  31 Nat'l Disability L. Rep. 180 (O.C.R. E.D., Boston 2005).  The complaint failed because there was a lack of evidence demonstrating the decision was discriminatory.  Id.

In College of St. Scholastica, the school was located in Minnesota, the study abroad program traveled to Ireland, and the discriminatory decision-making process occurred on campus in Minnesota.  3 Nat'l Disability L. Rep. 196 (O.C.R. Region V 1992). The complainant prevailed because the school had failed to take the necessary steps to ensure the student was not denied the benefits of or excluded from participation in the study abroad program due to the absence of effective auxiliary aids; the school also failed to show it had established a grievance procedure.  Id.

In St. Louis University, the school was located in Missouri, the study abroad program traveled to Spain, and the decision to deny the student his requested auxiliary aid occurred in Missouri. 1 Nat'l Disability L. Rep. 259 (O.C.R. Region VII 1990).  The university prevailed because the DOE determined that the university had complied with the statute.  Id.

These letters from the DOE do not stand on all fours with the facts of this case.  In the three letters Archut cites, the school was an American college with American-based administrators making decisions about accommodations within the United States.  Ross is foreign educational institution and all decisions about Archut's accommodations were made in St. Kitts.  Additionally, these letters fail to address the underlying question of extraterritoriality. They cannot support the proposition that the statute applies outside the United States.

Ross cites <u>Arizona State University</u>, an opinion letter from the DOE in 2001 that directly addressed the issue of extraterritoriality of Title II of the ADA and the RHA.  22 Nat'l Disability L. Rep. 239 (O.C.R. Region VIII 2001).  There, an American student complained that the American university failed to provide an interpreter during his trip to a study abroad program held in Ireland.  <u>Id.</u>  The school prevailed because the DOE determined that the two statutes "do not extend extraterritorially."  <u>Id.</u>  This is more persuasive than the opinions cited by Archut because <u>Ariz. State Univ.</u> squarely answers a question that the other three opinions avoid.

Archut argues that the criticism that Congress directed at the United States Supreme Court through the 1991 Civil Rights Act Amendments for failing to interpret civil rights statutes broadly is applicable here and should work to prohibit disability discrimination wherever federal funds are received.  (<u>See</u> Pl.'s Opp'n Br. at 18–19.)  This argument ignores the statement in <u>Morrison</u> addressing these very amendments: "Congress provided explicitly for extraterritorial application of Title VII, the statute at issue in <u>Aramco</u>.  All this shows is that Congress knows how to give a statute explicit extraterritorial effect—and how to limit that effect to particular applications, which is what the cited amendment did."  130 S.Ct. at 2883, n.8.

Archut characterizes the relationship between Defendants as "integrally incorporated," such that they should be treated for purposes of this motion as "one in [sic] the same." (See Pl.'s Opp'n Br. at 15–16.)  It is unclear what result Archut seeks from such treatment: (1) that Ross be considered a United States corporation much like DeVry, and thus subject to all anti-discrimination statutes, or (2) that DeVry be held responsible for acts taken by Ross's corporate agents in St. Kitts, namely Artemiou, Fox, and other administrators involved in denying Archut's requested accommodations.[8]  Archut does not provide case law or factually-based arguments supporting either result.  Neither argument is availing with respect to the extraterritorial issue of the RHA before the Court.

Archut argues that broad language in the statute regarding "any program receiving federal financial aid" encompasses all foreign and domestic programs meeting that description and binds them to the RHA's prohibition on disability discrimination.  (See Pl.'s Opp'n Br. at 15–16.)  This contact, even if seemingly central in the statutory scheme for United States institutions receiving aid, is not dispositive when deciding whether the law applies extraterritorially.  Morrison noted that most extraterritoriality disputes will feature defendants with ties to the United States and

---

[8] See Section iv. Anti-Discrimination Statutes and DeVry, infra, for a discussion of DeVry's liability.

19

that it would be "a rare case of prohibited extraterritorial application that lacks all contacts with the territory of the United States."  130 S.Ct. at 2884.  There, the Exchange Act covered "any person" and even referred explicitly to "foreign commerce," but the Court nonetheless held that it did not apply extraterritorially because Congress made no affirmative indication that such application was intended.  Id. at 2883.

Similarly in EEOC v. Arabian American Oil Co., despite broad definitions in Title VII for "employer" and "commerce," the Court determined that the statute did not contain a clearly expressed, affirmative intention of Congress that the statute should apply abroad.  499 U.S. 244, 248 (1991) ("Aramco").  In Aramco, the plaintiff was a naturalized American citizen while the defendants were two Delaware corporations, Arabian American Oil Company ("AAOC") and its subsidiary, Aramco Service Company ("ASC").  Id. at 247.  AAOC's principal place of business was in Saudi Arabia, but it was licensed to do business in Texas, where ASC maintained its principal place of business.  Id.  The plaintiff complained of employment discrimination that occurred in Saudi Arabia, where he worked for AAOC, after he was hired in Texas by ASC.  Id.  After closely examining Title VII, the Court found no indication that Congress intended extraterritorial application of the employment discrimination prohibitions and upheld the lower courts' entry of

20

judgment for the defendant employers on all of the plaintiff's federal claims.  Id. at 259.

After Aramco was decided, Congress amended Title VII to provide for extraterritorial application, repudiating the Court's decision in Aramco.  See Civil Rights Act of 1991, § 109, 105 Stat. 1077.  This amendment explicitly widens the definition of employee: "[w]ith respect to employment in a foreign country, such term includes an individual who is a citizen of the United States."  Id. It also provides for liability when the discriminating employer is an American company or controlled by an American company.  Id. Notably, Congress did not simultaneously (or later, since then) amend the provisions relating to public accommodations or commercial facilities.  Compare 42 U.S.C. § 12112(c), with 42 U.S.C. §§ 12181–12189; see also Becky J. Smith, 5 Nat'l Disability L. Rep. 20 (Dep't of Justice April 6, 1993).  Only the ADA's prohibition on disability discrimination in the employment context has received an express statement of extraterritorial application from Congress.  Much like in § 2000e-1 in Aramco and § 30(b) in Morrison, Congress chose to provide an explicit extraterritorial statement for only these small parts of a larger whole statute. 499 U.S. at 254-56; 130 S.Ct. at 2882-83.

In examining Aramco, the Court in Morrison noted that neither hiring on American soil nor the American citizenship of the plaintiff changed the outcome in Aramco; because Congressional

concern in Title VII had been focused on domestic employment, the statute would not reach extraterritorial employment standards, even though the facts of the case demonstrated the employment relationship had some contacts with the United States.  Morrison, 130 S.Ct. at 2884.  From this the Court turned to a textual analysis of the Exchange Act to determine what actions Congress had focused its attention on in drafting the Exchange Act, setting forth the analysis we now follow.  Id.

Looking solely at the text of the RHA, Congress crafted a statute to protect disabled individuals who are involved with institutions receiving federal funds.  29 U.S.C. § 794.  The statute concerns two intertwining policies: protection of disabled individuals and responsibilities attendant on acceptance of federal financial aid.  Examining each of these sections reveals that there is no clear statement that "this law applies abroad."  Neither are there indications in the wider context of the statute that Congress intended the RHA to apply extraterritorially.  The statute does not indicate that Congress was concerned with more than equality of domestic educational opportunities.

The portion of the statute directed at protecting disabled individuals targets discriminatory decision-making.  29 U.S.C. § 794 (prohibiting schools from discriminating against disabled students by causing that person to "be excluded from the participation in, be denied the benefits of, or be subjected to

22

discrimination"). The focus is centered on acts that constitute exclusionary or accommodating decisions. Thus, the location of the actor when such decisions are made is important, not the citizenship of the person affected by the decision. The text does not mention that these protections extend abroad, nor does it require foreign schools with American students or American-provided financial assistance to give disabled individuals the same accommodation. Congress did not include language or provide context in the statute to warrant applying the statute extraterritorially.

The RHA also targets institutions that accepted federal financial aid. 29 U.S.C. § 794 (prohibiting discrimination against individuals with disabilities "under any program or activity receiving Federal financial assistance"). This portion of the statute prohibits any programs receiving federal financial aid from discriminating against disabled individuals. The statute does not focus on where the program is located, only on whether it receives funds. This also fails to establish an "affirmative intention" that the RHA applies abroad. While federal funds are distributed to many institutions, some of which are beyond the physical territory of the United States, Congress failed to mention that these anti-discrimination standards for institutions receiving assistance were to follow wherever the money went. Without an express extension of the statute to foreign institutions receiving

23

federal financial aid, it cannot be implied that Congress actually intended such extraterritorial application.  The inclusion of "any program or activity receiving Federal financial assistance" is not a clear communication indicating that Congress intended foreign institutions receiving money to also be subject to these restrictions aimed at equalizing domestic educational, professional, or social opportunities for disabled individuals within the United States.

Archut also argues that Ross's conduct supports extending the RHA abroad to subject Ross to liability.  (See Pl.'s Opp'n Br. at 15-16, 21-24.)  The language in Ross's Student Handbook references the RHA, but does not bind Ross to those laws.  (See Pl.'s Opp'n Br. at 21-22.)  In support of her argument, Archut's papers cite a case from the District of New Jersey, Dean-Hines v. Ross University School of Veterinary Medicine, No. 05-3486 (Aug. 10, 2006) (dkt. entry no. 30).  That decision came four years before Morrison and addressed issues of selecting which state's substantive law governs a dispute, forum non conveniens, and contract claim preemption by NJLAD.  See id. at 5-19.  The Court does not find that this case supports the proposition that mentioning United States anti-discrimination standards in a student handbook binds a school to liability if it fails to meet the standards of laws it is not legally obligated to follow.  See Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 671 (3d Cir. 1999) (employer who "exceeded

the level that the law required" need not continue providing an overly burdensome, unreasonable accommodation).

Because the RHA contains no affirmative indication that Congress intended the law to apply extraterritorially, the Court concludes that Ross is not liable for any alleged violations of the statute.

### ii.   ADA and Ross

The ADA does not communicate an affirmative intention of extraterritorial application that would give rise to liability for acts performed in a foreign country.  Beginning with the text of the statute before examining the arguments of each party, the Court concludes that the statute reveals no express communication by Congress that foreign institutions offering public accommodations in foreign nations to American citizens are bound to provide reasonable accommodations to disabled individuals.

Title III of the ADA prohibits discrimination against disabled individuals in the full and equal enjoyment of public accommodations and public transportation services.  42 U.S.C. §§ 12182(a), 12184(a).  The general prohibitions are supplemented by more specific requirements. Entities that provide public accommodations or public transportation: (1) may not impose "eligibility criteria" that tend to screen out disabled individuals; (2) must make "reasonable modifications in polices, practices, or procedures, when such modifications are necessary" to

25

provide disabled individuals with full and equal enjoyment; (3) must provide auxiliary aids and services to disabled individuals; and (4) must remove architectural and structural barriers, or if barrier removal is not readily achievable, must ensure equal access for disabled individuals through alternative methods.  42 U.S.C. §§ 12182(b)(2)(A)(i)-(v), 12184(b)(1), 12184(b)(2)(A)-(C).

These specific requirements are subject to several exceptions and limitations.  Eligibility criteria that screen out disabled individuals are permitted when "necessary for the provision" of the services or facilities being offered.  42 U.S.C. §§ 12182(b)(2)(A)(i), 12184(b)(1).  Policies, practices, and procedures need not be modified, and auxiliary aids need not be provided, if doing so would "fundamentally alter" the services or accommodations being offered.  42 U.S.C. §§ 12182(b)(2)(A)(ii)-(iii).  Auxiliary aids are also unnecessary when they would "result in an undue burden."   42 U.S.C. § 12182(b)(2)(A)(iii).   The barrier removal and alternative access requirements do not apply when these requirements are not "readily achievable."  42 U.S.C. §§ 12182(b)(2)(A)(iv)-(v).

A "post graduate private school or other place of education" is included among the defined types of private entities that are considered "public accommodations," and therefore are subject to the prohibition on discrimination, if certain conditions are met. 42 U.S.C. § 12181(7)(J).  The private entities must be engaged in

26

operations that affect commerce to be considered public
accommodations.  42 U.S.C. § 12181(7).  Commerce is defined as
"travel, trade, traffic, commerce, transportation, or communication
(A) among the several States; (B) between any foreign country or
any territory or possession and any State; or (C) between points in
the same State but through another State or foreign country."  42
U.S.C. § 12181(1).

Following the analysis set forth in Morrison, we observe that
this statute contains no clear expression of extraterritorial
application of the anti-discrimination standards to foreign
institutions.  The text of the statute provides no indication
Congress intended to provide extraterritorial application of these
standards to foreign institutions offering public accommodations or
public transportation.  Moreover, in this piece of legislation,
Congress sought to reduce physical or other barriers to sites where
disabled individuals need access.  This focus is presumed to be
domestic, as no indication exists in the text of the statute to
suggest otherwise.  This statute is narrowly addressed to the
domestic issue of providing access for disabled United States
citizens.  It would be contrary to the rationale of the presumption
against extraterritoriality to interpret the text so as to require
foreign institutions to adhere to United States standards for
barrier removal and reasonable accommodations.

As the Court explained in <u>Morrison</u>, such a broad interpretation should be rejected because "[t]he probability of incompatibility with the applicable laws of other countries is so obvious that if Congress intended such foreign application it would have addressed the subject of conflicts with foreign laws and procedures." 130 S.Ct. at 2885 (citation and internal quotation marks omitted). If Congress had intended its law concerning building or safety codes to supplant or conflict with the law of foreign nations, then it would have dictated such results in the legislation that called for those responses. Where such extraterritorial applications have not been addressed by Congress in the text of the statute or clear contextual sources, they should not be imputed by courts' supposition.

We conclude that the requirements of the ADA with respect to institutions offering public accommodations do not apply extraterritorially to require foreign institutions to provide reasonable accommodations to American citizens with disabilities. Accordingly, Archut cannot prevail on such a claim against Ross.

### iii. NJLAD and Ross

The NJLAD does not apply extraterritorially to conduct in other states, nor to conduct occurring in foreign nations. Although the statute is most frequently analyzed in the context of employment discrimination disputes, the analysis is similar to that required here.

28

New Jersey courts have consistently applied the NJLAD only if
the claimant was discriminated against during employment in the
state.  See Weinberg v. Interep Corp., No. 05-5458, 2006 WL
1096908, at *6-7 (D.N.J. Apr. 26, 2006) (dismissing NJLAD claim
where New Jersey citizen was employed by a New York company in its
Pennsylvania office and low percentage of plaintiff's sales were to
New Jersey client).  The restriction on extraterritorial
application of the NJLAD derives from the well-settled principle
that "New Jersey law regulates conduct in New Jersey, not outside
the state."  Buccilli v. Timby, Brown & Timby, 283 N.J.Super. 6, 10
(App. Div. 1995).  This limitation has been repeatedly exercised in
cases brought by current residents and out-of-state plaintiffs
against out-of-state employers, with courts consistently holding
that the claim was governed by the law of the state where the
conduct occurred.  See id.; see also Peikin v. Kimmel & Silverman,
P.C., 576 F.Supp.2d 654, 657 (D.N.J. 2008) (listing cases).

A similar limitation prevents Archut from prevailing on her
NJLAD claim here.  Any allegedly discriminatory conduct which
Archut claims harmed her occurred through the decision-making
process in St. Kitts, where Archut attended school.  These out-of-
state acts are beyond the internal focus of the New Jersey
legislature in enacting the NJLAD and cannot be the predicate for
liability against Ross.  The NJLAD does not apply to conduct
occurring in other states because the legislature did not so

provide; similarly, conduct occurring in foreign nations is also beyond the reach of the statute.

### iv.   Anti-Discrimination Statutes and DeVry

DeVry is not liable under the RHA, ADA, or NJLAD for the actions of Ross's administrators in St. Kitts with respect to Archut.  Although DeVry was an educational institution within the United States throughout the time period applicable, the statutes under which Archut brought her claims do not contain provisions holding parent companies liable for actions of their foreign subsidiaries.

To hold DeVry liable for Ross's actions in St. Kitts through piercing the corporate veil would require some demonstration of fraud or misuse of corporate formalities:

> New Jersey recognizes the fundamental propositions that a
> corporation is a separate entity from its shareholders, and
> that a primary reason for incorporation is the insulation of
> shareholders from the liabilities of the corporate enterprise;
> accordingly, except in cases of fraud, injustice, or the like,
> courts will not pierce a corporate veil.

Hottenstein v. City of Sea Isle City, 793 F.Supp.2d 688, 691 (D.N.J. 2011) (internal citation and quotation marks omitted). Archut, however, did not plead any facts or present any evidence of fraud or injustice that would support piercing the veil to hold DeVry liable for the acts of its subsidiary with respect to the RHA or NJLAD.

As noted by Defendants in their reply brief, only the employment standards in Title VII of the ADA provide liability for companies that "control" foreign corporations that discriminate. (See dkt. entry no. 40, Defs.' Reply Mem. in Further Supp. of Mot. for Summ. J. at 3 (hereinafter "Defs.' Reply").)  Compare 42 U.S.C. § 12112(c), with 42 U.S.C. §§ 12181–12189.  Archut has not presented evidence that DeVry exerted such control over Ross.  Even if such evidence were presented to the Court, it could not create liability for Ross or DeVry because Congress did not also amend the public accommodations provisions of the ADA to provide for liability against the companies controlling discriminatory foreign institutions that fail to follow the standards set out in Sections 12181 through 12189.

Archut has not presented a theory of direct liability under the anti-discrimination statutes against DeVry.  Archut also has not demonstrated that DeVry is liable under any theory except that of alleged control over Ross, which is not viable under these statutes.  Archut's claims under the anti-discrimination statutes against DeVry fail entirely because the statutes do not create liability for companies controlling foreign institutions that violate the public accommodation standards of the ADA, RHA, or NJLAD.  Thus, DeVry is also not liable to Archut under the ADA, RHA, or NJLAD.

31

**B.     Jurisdiction**

Upon granting summary judgment in favor of Defendants on the federal claims, the Court questions its jurisdiction in this case. The Court notes that "[a] district court may decline to exercise supplemental jurisdiction over a claim if 'the district court has dismissed all claims over which it has original jurisdiction.'" Oras v. City of Jersey City, 328 Fed.Appx. 772, 775 (3d Cir. 2009) (quoting 28 U.S.C. § 1367(c)(3)).

> [W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.

Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000).

Archut brought this action in federal court premised on the Court's federal question jurisdiction over the RHA and ADA claims and supplemental jurisdiction under Section 1367 over the remaining state law claims. 28 U.S.C. § 1331; 28 U.S.C. § 1367; (See dkt. entry no. 1, Compl. at ¶ 1.). Although Archut did not plead jurisdiction under Section 1332, it appears from the allegations in the Complaint that diversity may exist as a secondary basis for the Court's jurisdiction in this case. Archut is a citizen of North Carolina. (Compl. at ¶ 2.) It appears that Ross is deemed to be a foreign citizen. (See Defs.' Mem. at 12-13; see also Defs.' Statement at ¶¶ 1-5.) DeVry is a Delaware corporation, maintaining

its principal offices in Illinois.  (Compl. at ¶ 4.)  Archut seeks compensatory and punitive damages for her injuries, but fails to provide any monetary amount of loss.  (Compl. at ¶ 74.)  Thus, the Court cannot determine whether the amount in controversy requirement has been satisfied.  See 28 U.S.C. § 1332.

The Court will deny the motion for summary judgment with respect to the breach of contract claims until such time as the parties fully address the jurisdictional issue under Section 1332.[9] Should the Court determine that Archut cannot satisfy the amount in controversy requirement, the Court will decline to exercise supplemental jurisdiction, and dismiss the claims without prejudice and with leave to bring those claims in state court.  The Court offers no opinion on the merits or the viability of those claims.

---

[9] Should the parties satisfy the Court that jurisdiction under Section 1332 exists, the parties would then need to address which law governs the contract claims: state law or the common law of St. Kitts.  (Compare Pl.'s Opp'n Br. at 37, with Defs.' Mem. at 38–39.) A court sitting in diversity applies the forum state's choice of law rules — here, New Jersey.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  In making a choice-of-law determination for a breach-of-contract claim, New Jersey courts ask which forum has the most significant relationship with the parties and the contract.  See State Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 84 N.J. 28, 417 A.2d 488, 491–92 (1980); Keil v. Nat'l Westminster Bank, 311 N.J.Super. 473, 710 A.2d 563, 569–70 (App.Div. 1998).  If the Court determines that the law of St. Kitts governs the contract dispute, the breach of contract claim may yet be subject to dismissal under the doctrine of forum non conveniens. See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 249 (1981).

**III. CONCLUSION**

      For the reasons stated <u>supra</u>, the Court will grant Defendants'
motion for summary judgment in part and deny it in part.  The Court
will issue an appropriate order and judgment.


                                                 s/ Mary L. Cooper
                                        **MARY L. COOPER**
                                        United States District Judge

Dated: November 19, 2012